**Reversed and Remanded and Opinion filed February 28, 2013.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-11-00611-CV

---

**GEORGE FLEMING AND FLEMING & ASSOCIATES, L.L.P., Appellants**

**V.**

**SANDRA KINNEY, ON BEHALF OF MAYBELL SHELTON, ANNETTE RUIZ, MICHELLE LINDESMITH, ELIZABETH PARAZANESE, HELEN SMITH BLAKENSHIP, RENEE GAONA, LANA BETH HERRON, ANNETTE VINCENT, CAROL MARTIN, AND SHIRLEY DANFORD, Appellees**

---

On Appeal from 215th District Court
Harris County, Texas
Trial Court Cause No. 2008-65396

---

## O P I N I O N

George Fleming and his law firm, Fleming & Associates, L.L.P., appeal from a judgment against them and in favor of Sandra Kinney, on behalf of Maybell Shelton; Elizabeth Parzanese; Annette Vincent; Annette Ruiz; Carol Martin; Renee Gaona; Helen Smith Blankenship; Lana Herron; Michelle Lindesmith; and Shirley

Danford.[1]  We reverse the trial court's judgment and remand for proceedings consistent with this opinion.

## FACTUAL BACKGROUND

This appeal arises in connection with claims asserted against attorney Fleming by former clients who contend that he improperly deducted certain expenses from their recoveries when they settled personal injury suits against pharmaceutical company Wyeth.

Fleming represented the former clients in litigation seeking recovery for personal injuries attributed to consumption of a combination of the prescription diet drugs fenfluramine and phentermine — "fen-phen" for short.  *See generally In re Diet Drugs*, 553 F. Supp. 2d 442, 449 (E.D. Pa. 2008).  Studies indicated an association between heart damage and the use of fenfluramine and dexfenfluramine; both were removed from the market in 1997.  *Id*.; *see also In re Diet Drugs*, 282 F.3d 220, 225 (3d Cir. 2002).  Some 18,000 individual suits and 100 class actions were filed after these drugs were withdrawn.

A federal multidistrict litigation (MDL) court was designated to handle fen-phen cases; the MDL court eventually certified a nationwide class action.  *See generally In re Diet Drugs*, 385 F.3d 386, 389-90 (3d Cir. 2004).  The MDL court established procedures to be followed by litigants who wished to opt out of the federal fen-phen class action and pursue individual claims.  Among other requirements, opt-out litigants had to establish their eligibility to sue under a scientific testing program that required them to undergo an echocardiogram resulting in a "FDA-positive" reading as measured by criteria established by the MDL court.  Cases that did not meet the "FDA-positive" threshold were subject to

---

[1] We refer to appellants Fleming and his law firm collectively as "Fleming."  We refer to the appellees collectively as the "former clients."

dismissal.

To address this requirement, Fleming set up a nationwide echocardiogram program supervised by a board-certified cardiologist at a cost exceeding $20 million. More than 40,000 potential clients were screened pursuant to this program; approximately 8,000 were determined to have "FDA-positive" echocardiograms that would allow Fleming to pursue individual claims on their behalf against Wyeth.

Fleming's clients signed written contingency fee agreements that allowed Fleming to recover reasonable expenses incurred in handling each client's claim. As an example, the fee agreement between Maybell Shelton[2] and Fleming stated as follows:

> In the event of a recovery, the Client understands and agrees that out of the Client's portion of any recovery, the Firm will be paid all reasonable costs, charges or expenses made or incurred by the firm in the Firm's handling of the Client's claim and causes of action, including but not limited to expenses or charges for court costs, filing fees, certified mailing fees, depositions, expert witnesses, long distance telephone, travel, parking, data management, investigation, research, telecopying and photocopying at the Firm's normal rate, costs or charges for pretrial and trial exhibits and any other reasonable charges or costs made or advanced by the Firm.

Fleming ultimately entered fee agreements with 8,051 clients.

Fleming and Wyeth engaged in settlement negotiations in 2005. Wyeth insisted on an aggregate settlement to which at least 95 percent of Fleming's clients had to agree. Wyeth and Fleming agreed to an aggregate settlement in May 2006 that totaled $339 million and encompassed all of Fleming's 8,051 clients.

Fleming's clients received a settlement packet, which included a grid

---

[2] The late Maybell Shelton was Sandra Kinney's mother.

showing the sums assigned to each of the 8,051 clients. The settlement packets also included a settlement statement showing deductions for expenses, attorneys' fees, and other items. More than 95 percent of Fleming's 8,051 clients consented in writing to the settlements, including payment of a proportionate share of expenses.

## PROCEDURAL BACKGROUND

Sandra Kinney filed this suit in 2008. Among other things, she asserted that Fleming breached his fiduciary duty to Maybell Shelton when he deducted from her fen-phen recovery a share of expenses attributable to echocardiograms performed on thousands of other potential clients who ultimately were deemed not to be "FDA-positive" after screening and whose cases were turned down by Fleming.

Eventually, more than 600 former clients sued Fleming in this case. They alleged claims for breach of contract, breach of fiduciary duty, fraud, conversion, statutory theft, and unjust enrichment. The trial court selected 10 plaintiffs from this group for trial pursuant to a Rule 11 agreement.

At trial in late 2010, the parties hotly contested many aspects of the settlement including the propriety of deducting expenses attributable to non-client echocardiograms from recoveries obtained for Fleming's 8,051 fen-phen clients.

The former clients contend that only echocardiogram costs attributable to an individual client's own FDA-positive echocardiogram should have been deducted. According to the former clients, Fleming's decision to allocate a proportionate share of non-client echocardiogram costs to his 8,051 clients improperly boosted Fleming's fees from the $339 million aggregate settlement by more than $20 million at their expense.

According to Fleming, allocating a proportionate share of non-client

4

echocardiogram expenses to his settling clients was reasonable and appropriate because creating a sophisticated, selective, and scientifically sound screening program was essential to (1) demonstrate that his 8,051 clients actually had compensable injuries notwithstanding the absence of medical expenses related to diet drugs; and (2) convince Wyeth to settle. Fleming contends that the high percentage of potential clients whose cases were rejected bolstered the strength of cases that ultimately were accepted and filed; therefore, according to Fleming, his clients' interests were advanced by all of the echocardiograms that were conducted — not just by their own individual "FDA-positive" echocardiograms.

The former clients presented expert testimony at trial from attorney Lillian Hardwick. Her testimony included the following opinions.

- "My opinion is that Mr. Fleming violated the fiduciary duties of candor and loyalty in two primary respects with the allocation issue."

- "The first way is that this was a group representation. And in my opinion, that was not revealed to the clients and it should have been revealed to the clients in their settlement package."

- "The second way is that in having a group allocation that Mr. Fleming was doing, he had conflicted loyalties among the various clients and he had a conflict with his own personal interest. And that was not revealed to the clients."

- "In essence, you started out with their individual contracts where you had individual representation, and all of a sudden in the settlement package you have a group representation with an allocation made specifically and only by Mr. Fleming. And that breaches the duty of loyalty and it breaches the duty of candor, and that was not

5

explained."

- Fleming failed to explain to his clients that Wyeth required 95 percent acceptance by all of the clients, and that Fleming was not going to recoup his expenses unless 95 percent of his clients accepted Wyeth's offer.

- Hardwick answered "no" in response to a question asking: "Did you see any informed consent with respect to any of these violations or conflicts?" Hardwick continued: "And in the disciplinary rules we talk about consents after consultation, and we actually have a definition with regard to that. And essentially, that means informed consent which means that the client has sufficient information to be able to make a knowledgeable decision."

- Fleming breached his fiduciary duties of candor and loyalty by passing non-client echocardiogram expenses on to his clients. Hardwick opined that Fleming violated his duty of loyalty in this connection because "these are not expenses at all. They are not expenses related to the case incurred in the prosecution of this individual's case."

- Fleming violated his duty of candor by failing to explain in the settlement packages that he was passing along non-client echocardiogram expenses to his clients.

As discussed more fully in the analysis below, Fleming challenges the admissibility of Hardwick's expert testimony.

The trial court submitted claims for fraud, breach of contract, and breach of fiduciary duty to the jury in the charge. The former clients voluntarily nonsuited

6

their fraud claim as to the 10 trial plaintiffs during jury deliberations after the jury announced that it was deadlocked on that claim. The jury answered "no" as to nine of the former clients in response to Question 2A asking whether Fleming failed to comply with the attorney-client contract, and "yes" as to Michelle Lindesmith. The jury answered "no" as to all 10 former clients in response to Question 1 asking whether Fleming complied with the fiduciary duty owed to each client.[3]

The damages submission in Question 4 was predicated on a "no" answer as to any plaintiff in response to Question 1 or a "yes" answer as to any plaintiff in response to Question 2A. The jury awarded damages to each of the 10 former clients for "the amount of unreasonable expenses, if any that were charged to that plaintiff." The damages awarded for unreasonable expenses ranged from $36.42 to $73,596.66. The jury awarded zero dollars as to each former client for "[d]amages, if any, caused by the method of expense allocation."

The trial court signed a judgment in conformity with the jury's verdict awarding damages to each former client for unreasonable expenses. In addition, the final judgment ordered Fleming to disgorge 32 percent of the amount paid in attorney's fees for each of the 10 trial plaintiffs; the dollar value of the disgorged fees ranged from $2,379.43 to $251,262.58. The trial court severed the 10 trial plaintiffs' claims from those of the remaining former clients, resulting in a final and appealable judgment. Fleming timely appealed.

## ANALYSIS

Fleming raises four issues on appeal challenging the trial court's final judgment. He contends that (1) liability for breach of fiduciary duty arising in connection with written attorney-client fee contracts is foreclosed under the

---

[3] Lindesmith elected to recover damages on her claim for breach of fiduciary duty.

7

economic loss rule; (2) the trial court abused its discretion by admitting testimony from the former clients' liability expert Lillian Hardwick; (3) the breach of fiduciary duty question submitted in the jury charge was erroneous; and (4) the trial court erred in ordering fee forfeiture.

## I.  Economic Loss Rule

In connection with his first issue, Fleming asks this court to reverse the trial court's judgment and render a take-nothing judgment in his favor because the former clients' breach of fiduciary duty claims predicated on disputed echocardiogram charges "sound in contract, not fiduciary duty."  He argues that the economic loss rules applies here to preclude a tort-based recovery because "the plaintiffs' complaints all focus on the economic loss to the subject of their fee contracts" with Fleming.  More particularly, Fleming urges that the former clients' claims sound in contract alone because (1) the claims arise from expenses deducted from their recoveries under their individual attorney-client fee contracts; and (2) the contracts permitted Fleming to deduct "reasonable costs, charges or expenses made or incurred by the firm in the Firm's handling of the Client's claim and causes of action, including but not limited to expenses . . . ."  Under this analysis, Fleming contends that this court should reject the fiduciary duty claims as a matter of law based on the economic loss rule.

The economic loss rule "addresses efforts to use negligence and product liability claims as vehicles for recovery of economic losses."  *Barzoukas v. Found. Design, Ltd.*, 363 S.W.3d 829, 834 (Tex. App.—Houston [14th Dist.] 2012, pet. filed) (citing *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 414-18 (Tex. 2011)).  Despite its name, this doctrine is not a single, neatly defined "rule;" instead, the economic loss rule "encompasses multiple concepts addressing efforts to recover particular economic losses in particular situations."  *Barzoukas*,

8

363 S.W.3d at 834 (citing *Sharyland*, 354 S.W.3d at 414-15).

The economic loss rule forecloses pursuit of a strict liability claim arising from a defective product that damages itself but no other property. *Sharyland*, 354 S.W.3d at 415-17. The rule also forecloses pursuit of a negligence claim predicated on a duty created under a contract to which the plaintiff is a party when tort damages are sought for an injury consisting only of economic loss to the subject of the contract. *Id.* at 417-18. "In these two contexts, economic losses are more appropriately addressed through statutory warranty actions or common law breach of contract suits instead of tort claims." *Barzoukas*, 363 S.W.3d at 835 (citing *Sharyland*, 354 S.W.3d at 417-18).

The economic loss rule's reach does not automatically extend to all tort claims in all contexts involving disputes related in some way to a contract. For example, the supreme court declined to extend the economic loss rule to foreclose a fraudulent inducement claim even when the claimed damages consisted of economic losses to the subject of a contract. *Sharyland*, 354 S.W.3d at 417-18 (citing *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998)).

Fleming invites us to apply the economic loss rule in this context involving claims for breach of fiduciary duty related to the attorney-client fee agreements between Fleming and his former clients. In support of this proposition, he cites several cases discussing the economic loss rule in the context of claims for breach of fiduciary duty arising from relationships that do not involve attorney-client fee agreements. *See Stauffacher v. Coadum Capital Fund 1, LLC*, 344 S.W.3d 584, 591 (Tex. App.—Houston [14th Dist.] 2011, pet. denied); *see also Fish v. Tex. Legislative Serv.*, No. 03-10-358-CV, 2012 WL 254613, at *14-*15 (Tex. App.—Austin Jan. 27, 2012, no pet.) (mem. op.); *Thomason v. Collins & Aikman*

9

*Floorcoverings, Inc.*, No. 04-02-00870-CV, 2004 WL 624926, at *3 (Tex. App.—San Antonio March 31, 2004, pet. denied) (mem. op.); *Villanueva v. Gonzalez,* 123 S.W.3d 461, 467 (Tex. App.—San Antonio 2003, no pet.); *Classical Vacations v. Air France*, No 01-01-01137-CV, 2003 WL 1848247, at *2-*3 (Tex. App.—Houston [1st Dist.] Apr. 10, 2003, no pet.) (mem. op.).

Fleming cites no case that has expressly applied the economic loss rule to foreclose a breach of fiduciary duty claim arising in connection with an attorney-client fee agreement, and we have located no such case. Fleming points to *Herter v. Wolfe*, 961 S.W.2d 1, 5 (Tex. App.—Houston [1st Dist.] 1995, writ denied), in which the court concluded without analysis or citation to legal authority that a former client failed to assert a viable breach of fiduciary duty claim against its former attorney that was distinct from its claim for breach of the attorney-client fee agreement. Without referencing the economic loss rule or case law discussing that doctrine, the court concluded that the "[the client's] . . . claims for breach of fiduciary duty are the same claims in the breach of contract suit, merely recast as breach of fiduciary duty." *Id*. Because *Herter* does not mention the economic loss rule, we believe it more accurately is read as holding that the record before the court contained no evidence to support a breach of fiduciary duty claim. *Id*.

At least one case has concluded that the economic loss rule does not apply in the context of a tort claim arising in connection with an attorney-client fee agreement. *Estate of Arlitt v. Paterson*, 995 S.W.2d 713, 719 (Tex. App.—San Antonio 1999, pet. denied), *disapproved on other grounds in Belt v. Oppenheimer, Blend, Harrison & Tate, Inc.*, 192 S.W.3d 780, 785 (Tex. 2006).

The Texas Supreme Court has not squarely addressed whether the economic loss rule applies to foreclose tort claims arising in connection with an attorney-client fee agreement. To resolve the issue presented here, we need not and do not

10

determine whether under other circumstances the economic loss rule could foreclose tort claims related to an attorney-client fee contract. The supreme court's teaching on Texas public policy considerations unmistakably places this particular attorney-client fee dispute beyond the economic loss rule's reach.

The existence of an attorney-client fee agreement does not automatically foreclose a client's pursuit of a breach of fiduciary duty claim. Looking specifically at a fee dispute centering on interpretation of an attorney-client fee agreement, the supreme court has stated as follows: "Because a lawyer's fiduciary duty to a client covers contract negotiations between them, such contracts are closely scrutinized." *Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 450 (Tex. 2011). "Part of the lawyer's duty is to inform the client of all material facts." *Id*. "And so that this responsibility is not a mere and meaningless formality, the lawyer must be clear." *Id*. The supreme court also has stated: "When interpreting and enforcing attorney-client fee agreements, it is 'not enough to simply say that a contract is a contract. There are ethical considerations overlaying the contractual relationship.'" *Hoover Slovacek LLP v. Walton*, 206 S.W.3d 557, 560 (Tex. 2006) (quoting *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 868 (Tex. 2000) (Gonzales, J., concurring and dissenting)). These "overlaying" considerations impact analysis of an attorney-client fee agreement even when a jury has determined that the attorney fully satisfied all fiduciary duties owed to the client. *See Anglo-Dutch Petroleum Int'l, Inc.,* 352 S.W.3d at 449-53. The supreme court's observations run counter to Fleming's suggestion that the mere existence of an attorney-client contract allows contractual duties to operate to the exclusion of fiduciary duties.

This conclusion is reinforced by looking more broadly at cases discussing economic losses in the context of malpractice claims predicated on a negligence-

11

based failure to satisfy the duty of care in performing legal services.

"[W]hen an attorney's malpractice results in financial loss, the aggrieved client is fully compensated by recovery of that loss; the client may not recover damages for mental anguish or other personal injuries." *Belt*, 192 S.W.3d at 784 (citing *Douglas v. Delp*, 987 S.W.2d 879, 885 (Tex. 1999)). "Thus, estate-planning malpractice claims seeking recovery for pure economic loss are limited to recovery for property damage." *Id*. "Therefore, in accordance with the long-standing, common law principle that actions for damage to property survive the death of the injured party, we hold that legal malpractice claims alleging pure economic loss survive in favor a deceased client's estate, because such claims are necessarily limited to recovery for property damage." *Id*.; *see also Douglas*, 987 S.W.2d at 885 ("[W]hen the injuries caused by an attorney's negligence are economic, the plaintiff can be fully recompensed by the recovery of any economic loss.").

When an attorney-client relationship exists and recovery for breach of the applicable duty is limited solely to economic losses, the supreme court still recognizes that the former client may assert a tort claim against the attorney; limits may exist because courts have circumscribed the scope of the available tort remedy. *See Belt*, 192 S.W.3d 783. Limits on recovery exist in this context because the supreme court has circumscribed the scope of available tort remedies for a claim sounding in tort — not because a contract claim supplants the tort claim.

It is accurate — but not precise — to characterize the former clients' claims in this case as a dispute arising in connection with expense deductions under an attorney-client fee contract. A more accurate and more precise characterization is that the former clients contend Fleming impermissibly put his own interests ahead

12

of theirs when he allegedly made a strategic but undisclosed decision to pay for court-mandated testing by deducting echocardiogram expenses attributable to other people who were screened out of the litigation at the outset. The economic loss rule does not bar the clients' claims for breach of fiduciary duty under these circumstances.

We reject Fleming's contention that his former clients' claims sound solely in contract, and we overrule his first issue.

## II. Admission of Expert Testimony

In his second issue, Fleming assails the trial court's admission of expert testimony proffered by attorney Lillian Hardwick. Fleming attacks Hardwick's qualifications to opine regarding liability for breach of fiduciary duty in connection with an aggregate settlement; he also contends that the substantive content of her opinions renders them inadmissible.

Trial courts can admit testimony addressing "scientific technical, or other specialized knowledge" from "a witness qualified as an expert by knowledge, skill, experience, training, or education" when doing so "will assist the trier of fact to understand the evidence or to determine a fact in issue . . . ." Tex. R. Evid. 702. This rule applies to expert testimony addressing the duties attorneys owe to their clients. *Greenberg Traurig of N.Y., P.C. v. Moody*, 161 S.W.3d 56, 93-94 (Tex. App.—Houston [14th Dist.] 2004, no pet.). "Thus, for an expert's testimony to be admissible, the expert must be qualified and the expert's opinion must be relevant to the issues in the case and based upon a reliable foundation." *Id*. at 93. This court reviews the decision to admit or exclude expert testimony under this standard for abuse of discretion. *Id*. (citing *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002)).

13

Fleming preserved his challenges to Hardwick's testimony in the trial court by filing a motion to exclude this testimony under Texas Rule of Evidence 702 and *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995). Fleming challenged the admissibility of Hardwick's testimony on grounds that (1) "she is not qualified to address the issues in this case;" (2) "her proposed testimony is not relevant and will not assist the trier of fact;" (3) "her opinions are unsupported and unreliable;" and (4) "any probative value her opinions may have is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading of the jury."

Fleming discussed these objections with the trial court in the course of a pretrial hearing at which Fleming sought to exclude 41 specific statements from Hardwick's supplemental expert designation; 49 statements from her affidavit; and 41 statements from her deposition. The trial court overruled the motion to exclude Hardwick's testimony as to all challenged statements during the hearing. These steps preserved Fleming's appellate challenges with respect to Hardwick's qualifications and the content of her opinions. *See Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex. 2004).

### A. Qualifications

Resolving Fleming's threshold challenge to Hardwick's qualifications requires some context. Hardwick's testimony addressed compliance with the fiduciary duties that attorneys owe to clients in connection with charging litigation expenses as part of an aggregate settlement. Fleming faults Hardwick's level of experience in dealing with settlements of this nature.

"An aggregate settlement occurs when an attorney, who represents two or more clients, settles the entire case on behalf of those clients without individual negotiations on behalf of any one client." *Authorlee v. Tuboscope Vetco Int'l, Inc.*,

14

274 S.W.3d 111, 120 (Tex. App.—Houston [1st Dist.] 2008, pet. denied). Undisclosed aggregate settlements are prohibited. *See* Tex. Disciplinary Rules Prof'l Conduct R. 1.08(f), *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G, app. A (Vernon 2005) (Tex. State Bar R. art. X, § 9) ("A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients . . . unless each client has consented after consultation, including disclosure of the existence and nature of all the claims or pleas involved and of the nature and extent of the participation of each person in the settlement.").

According to Fleming, Hardwick is not qualified to testify as an expert because she "has little experience at the courthouse," "[n]o client has ever hired her," and "she has never tried a case . . . ." Fleming further asserts that Hardwick "has never been in charge of a mass tort case; she has never negotiated a mass or aggregate settlement; she stopped the active practice of law in 2004; this is her first time assessing an aggregate settlement; and she has no expertise in mass actions, class actions, or pharmaceutical litigation."

We reject Fleming's challenge to Hardwick's expert qualifications. While the extent of practical experience may be a factor to be considered in assessing an expert's qualifications depending on the circumstances, this factor is not dispositive here.

Hardwick described her qualifications in her testimony. She obtained a bachelor's degree and a J.D. from the University of Houston, and a Ph.D. in English from the University of Texas. She has been licensed to practice law in Texas since 1989. In private practice she worked on "mass action" litigation arising from rollover accidents involving Firestone tires and Ford Explorer vehicles; she also supervised discovery for "mass action" and class action litigation involving homeowners claiming property damage from leaking polybutylene

15

piping. Additionally, she was part of the "national defense team" representing Remington Arms in connection with claims for injuries attributed to misfiring guns.

Hardwick has served since 2001 as a member of the committee of the State Bar of Texas that drafts and revises proposed language for the Texas Disciplinary Rules of Professional Conduct. She served as co-chair of this committee from 2006-07 and as chair from 2007-10. Hardwick told the jury that she regularly has met and worked with members of the Supreme Court of Texas in connection with shaping the rules' content, including Chief Justice Jefferson and former Justice Wainwright. She testified that, after she became chair of the committee in 2007, she "organized five days of presentations before the court and the court's rules attorney" in response to a request from Justice Johnson. Hardwick stated that "we did detailed presentations to the court on our views about the individual rules." Hardwick agreed that she is "extremely familiar" with these rules based on her service on this committee, and testified that she received an award from the State Bar of Texas for this work.

In 2003, Hardwick began working as a consultant with a focus on attorney and judicial ethics. She testified, ". . . I don't have a normal law practice where I represent individuals. I provide consulting in the areas of attorney and judicial ethics . . . . And sometimes my consulting results in my doing expert witness work like this." She has served as an expert witness on behalf of lawyers against whom grievances have been filed asserting violations of the disciplinary rules. She also has served as an expert witness on behalf of judges in connection with proceedings involving the State Commission on Judicial Conduct. She is a co-author of the Handbook of Texas Lawyer and Judicial Ethics: Attorney Tort Standards, Attorney Ethics Standards, Judicial Ethics Standards, Recusal and Disqualification

16

of Judges.

Based on this background and experience, the trial court acted within its discretion in concluding that Hardwick is qualified to testify as an expert with respect to compliance with the fiduciary duties that attorneys owe to clients in the context of charging litigation expenses as part of an aggregate settlement. *See Rodgers v. Comm'n for Lawyer Discipline*, 151 S.W.3d 602, 617 (Tex. App.—Fort Worth 2004, pet. denied) (attorney was qualified to testify as expert regarding violations of disciplinary rules pertaining to lawyer advertising based on attorney's experience as member and chair of state bar's advertising review committee). We next address Fleming's challenges to the content of Hardwick's testimony as an expert.

## B.    Content of Testimony

Mapping the contours of permissible testimony from an expert presents challenges because it is easier to explain what an expert ***cannot*** say than it is to explain what the expert ***can*** say. The case law provides some general precepts to begin the analysis.

"An expert may state an opinion on a mixed question of law and fact if the opinion is limited to the relevant issues and is based on proper legal concepts." *Greenberg Traurig*, 161 S.W.3d at 94 (citing *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 619-20 (Tex. 1999)); *see also Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361, 365 (Tex. 1987). "An issue involves a mixed question of law and fact when a standard or measure has been fixed by law and the question is whether the person or conduct measures up to that standard." *Greenberg Traurig*, 161 S.W.3d at 94 (citing *Mega Child Care, Inc. v. Tex. Dep't of Protective & Regulatory Servs.*, 29 S.W.3d 303, 309 (Tex. App.—Houston [14th Dist.] 2000, no pet.)).

17

"An expert, however, may not testify on pure questions of law." *Greenberg Traurig*, 161 S.W.3d at 94 (citing *Mega Child Care, Inc.*, 29 S.W.3d at 309.) "Thus, an expert is not allowed to testify directly to his understanding of the law, but may only apply legal terms to his understanding of the factual matters in issue." *Greenberg Traurig*, 161 S.W.3d at 94 (citing *Welder v. Welder*, 794 S.W.2d 420, 433 (Tex. App.—Corpus Christi 1990, no writ)). "It is not the role of the expert witness to define the particular legal principles applicable to a case; that is the role of the trial court." *Greenberg Traurig*, 161 S.W.3d at 95.

An expert must testify before the jury has received the jury charge and before it has been instructed on specific elements and standards concerning specific claims. The lawyers, the expert, and the judge begin trial with knowledge of the generally applicable duties and their potential scope; the jurors do not. In order for an expert to meaningfully "apply legal terms to his understanding of the factual matters in issue" in a way that assists the jury, *see Greenberg Traurig*, 161 S.W.3d at 94, the expert must have some leeway to reference the controlling "legal terms" and related concepts while testifying. Otherwise, a jury would not be able to make sense of the expert's testimony or measure it against the charge's requirements, and the sponsoring litigant could not meet a motion for directed verdict.

It follows that the standards governing admission of expert testimony do not automatically foreclose every reference to legal terms or the disciplinary rules in the course of expert testimony addressing an attorney's alleged breaches of the duties owed to a client. *See Piro v. Sarofim*, 80 S.W.3d 717, 720 (Tex. App.— Houston [1st Dist.] 2002, no pet.). Such an expert properly may include these references when the trial court sets appropriate limits. *See id.* The continuum of potentially relevant testimony from an expert likely will vary according to the

18

specific facts and the specific legal standards being litigated in specific cases.

As summarized above in connection with the procedural history of this case, Hardwick permissibly testified regarding general fiduciary duty concepts and her opinion that Fleming's handling of non-client echocardiogram expenses violated the applicable duties. But she also went much further. Hardwick's testimony is problematic because she was allowed to testify without any limits whatsoever.

Hardwick's testimony crossed the border of inadmissibility when she undertook to (1) explain to the jury the application of specific Texas Disciplinary Rules of Professional Conduct, along with the asserted "interaction" between these rules and fiduciary duty standards; (2) opine that Fleming violated at least half a dozen specific disciplinary rules, identified by number; and then (3) tell the jury that violating the enumerated rules "necessarily" established a breach of the fiduciary duty Fleming owed to his clients. Testimony of this nature runs afoul of the reliability requirement, and of the prohibition against testimony concerning pure questions of law.

This conclusion flows from the following portions of Hardwick's testimony.

- At the outset of her testimony, Hardwick told the jury: "I'm here to explain to the jury about the interaction between the Texas [D]isciplinary [R]ules of [P]rofessional [C]onduct and attorney breach of fiduciary duty law in Texas."

- Fleming "violated the fiduciary duty of candor as it is expressed in certain of the disciplinary rules." When asked to identify which ones, Hardwick responded: "1.02, 1.03, 1.04 and 1.06."

- Fleming "violated his fiduciary duty of loyalty as the duty is expressed in certain of the disciplinary rules of professional conduct."

19

When asked to identify which ones, Hardwick responded: "1.02, 1.04, 1.06, 1.07, 1.08 and 1.14."

- Harwick answered "no" to a question asking: "Under the Texas disciplinary rules and the fiduciary duty as they interact, can a settlement statement like the one that you have seen in this case be used by a lawyer to say you signed it, that's it, you don't get to come back and say, hey, wait a minute, this isn't right."

- In response to a request from the former clients' attorney to "[e]xplain to us, generally, what fiduciary duty means," Hardwick responded as follows: "Fiduciary duty is the duty that you undertake when you decide to act on behalf of somebody else. And a lawyer is one type of a fiduciary, but because the lawyer-client relationship is so trusting and so important, a lawyer is said to be held to the highest of fiduciary duties."

- Hardwick then answered affirmatively to each in a series of questions from the former clients' counsel concerning specific aspects of fiduciary duty.

   o "A lawyer in dealing with a client in a transaction, do they need to be fair and equitable?"

   o "A lawyer in dealing with clients, does the lawyer need to make reasonable use of client confidence?"

   o "A lawyer in dealing with a client, does a lawyer have to act with utmost good faith?"

   o "They have to exercise scrupulous honesty?"

   o "A lawyer in dealing with a client, is a lawyer required to put

20

the client's interest before his own?"

- o "Is a lawyer required to not use the advantage of the lawyer's position to benefit the lawyer?"

- o "And is a lawyer required in dealing with a client to not place himself in a position where self-interest might conflict with his fiduciary obligations?"

- After the series of affirmative responses from Hardwick, the former clients' counsel asked this question: "Are these – these basic tenets of fiduciary duty, are they consistent with the Texas [D]isciplinary [R]ules of [P]rofessional [C]onduct?" Hardwick responded: "Yes. In that all of the Texas [D]isciplinary [R]ules of [P]rofessional [C]onduct that are designed to protect the individual client were drawn from fiduciary duty."

- Hardwick also answered affirmatively to an additional question from the former clients' counsel asking, "In dealing with a client, is a lawyer required to fully and fairly disclose all important information?" Hardwick stated: "Yes, that's the duty of candor."

- The former clients' counsel asked Hardwick: "These principles of fiduciary duty, are they something that a lawyer can choose to ignore?" She responded: "Oh, no. Oh, no. The standard of conduct applies to all 80 thousand lawyers in Texas. The [D]isciplinary [R]ules of [P]rofessional [C]onduct apply to all 80 thousand lawyers in Texas."

- The former clients' counsel asked Hardwick: "Tell us how the Texas [D]isciplinary [R]ules of [P]rofessional [C]onduct interact with the

21

fiduciary duties and these principles that we have talked about." Hardwick responded: "In the mid 1980s, when . . . my predecessor committee was deciding what the current rules would be, they made a conscious attempt to bring more fiduciary duty and the case law into the disciplinary rules. We have done the same thing. So basically, they are a reflection to the extent that we can actually come up with disciplinary rules of all the fiduciary duties in the common law that lawyers have."

- Hardwick then testified: "If you violate one of these rules of professional conduct that is designed to protect the client, then you have necessarily violated a fiduciary duty, the very fiduciary duty that underlies a particular rule."

- The former clients' counsel stated: "Ms. [Hardwick], I have got a bunch of boards over there that have each individual rule. Do you think, and there is a number of them. Do you think that would be helpful to explain your testimony or are you comfortable that you expressed your opinions and the basis for them thus far?" Hardwick answered: "I'm comfortable with that, but they are tied to those specific rules that I mentioned at first and you wrote down."

Hardwick's testimony was unreliable insofar as she testified that a lawyer who violated the disciplinary rules "necessarily violated a fiduciary duty, the very fiduciary duty that underlies a particular rule."

This testimony is unreliable because it contravenes Texas law. "Violation of a rule does not give rise to a private cause of action **nor does it create any presumption that a legal duty to a client has been breached**." Tex. Disciplinary Rules Prof'l Conduct preamble ¶ 15 (emphasis added). "The fact that a rule is a

22

just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the rule." *Id.* "Accordingly, nothing in the rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such a duty." *Id.*; *see also Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 158 n.2 (Tex. 2004) ("[W]e note that the Rules do not define standards of civil liability of lawyers for professional conduct."); *Greenberg Traurig*, 161 S.W.3d at 96-97 (trial court erred in allowing expert witness to testify that "the standard of care for attorneys is based on the Texas disciplinary rules when no such liability can be based on any violations of those rules").

The circumstances here parallel *Greenberg Traurig*, in which this court held that the trial court erred when it admitted expert testimony from a law professor and a former Texas Supreme Court justice in connection with a suit alleging securities fraud and related claims against a law firm. *See Greenberg Traurig*, 161 S.W.3d at 62. The error encompassed allowing these experts to (1) testify on questions of law, and (2) offer unreliable opinions that did not correctly reflect Texas law. *Id.* at 95-97.

With respect to the former justice, this court noted as follows: "The vast majority of his testimony, based on his understanding and interpretation of the Texas Disciplinary Rules of Professional Conduct, was devoted to explaining to the jury an attorney's obligations with regard to disclosure and withdrawal from representation in various scenarios involving the discovery of a client's fraud." *Id.* at 95. This testimony was erroneous and unreliable because the attorneys at issue were not licensed to practice law in Texas; "were not specially admitted by a Texas court for any particular proceeding relevant to this case;" and thus were not subject

23

to the Texas disciplinary rules. *Id*. at 96. The court continued: "Even if Greenberg Traurig's attorneys had been licensed to practice in Texas and, thus, subject to the Texas disciplinary rules, those rules do not establish the standard of care or civil liability for attorneys." *Id*. at 96. "Therefore, it was error for the trial court to permit former Justice Wallace to testify that the standard of care for attorneys is based on the Texas disciplinary rules when no such liability can be based on any violation of those rules." *Id*. at 96-97.

*Greenberg Traurig*'s conclusion applies with equal force here. Because Hardwick's testimony equating disciplinary rule violations with *per se* breaches of fiduciary duties was unreliable, the trial court abused its discretion in admitting this testimony. *See id.* And because Hardwick predicated her testimony from the outset on an asserted intertwining of and "interaction between the Texas [D]isciplinary [R]ules of [P]rofessional [C]onduct and attorney breach of fiduciary duty law in Texas," this error impacted the entirety of her testimony with respect to Fleming's asserted breaches of the fiduciary duty he owed to his clients.[4]

We reject the former clients' suggestion that Fleming's subsequent testimony waived or rendered harmless the error arising from admission of Hardwick's testimony. After Hardwick testified, Fleming testified on direct, cross, and redirect examination as an adverse witness during the former clients' case in chief; he stated that he complied with specific disciplinary rules. Fleming was

---

[4] Hardwick also testified during redirect examination about a law review article discussing *Burrow v. Arce*, 997 S.W.2d 229 (Tex. 1999). Hardwick described the case as "a pivotal Texas Supreme Court opinion that established that the damage to a client from a lawyer's breach of fiduciary duty lies in the breach itself." She further described it as a case "that says a client does not have to establish monetary damages or some kind of tangible harm to recover from a lawyer's breach of fiduciary duty. That the harm is the fact that the lawyer actually breached the duty." The trial court overruled a motion to strike this testimony. *Greenberg Traurig* determined that admission of an expert's testimony regarding his interpretation of a named opinion from the Texas Supreme Court was erroneous. *See* 161 S.W.3d at 97.

24

entitled to counter Hardwick's testimony after it had been admitted over his objection, and to answer the questions asked of him; he was not required to give up at trial in order to preserve his complaint for appeal. *See Roosth & Genecov Prod. Co. v. White*, 152 Tex. 619, 262 S.W.2d 99, 104 (1953) ("Nor can it be said that the objection was waived by such defensive steps as the petitioner took by way of cross-examination and explanatory testimony once the objectionable evidence was admitted."), *overruled on other grounds by Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 925 (Tex. 1981).

The record here further demonstrates that the error arising from admission of Hardwick's testimony was harmful because it probably caused the rendition of an improper judgment. *See* Tex. R. App. P. 44.1; *Greenberg Traurig*, 161 S.W.3d at 98. Here, as in *Greenberg Traurig*, the expert "opined at length that the disciplinary rules set forth the standard for civil liability for attorney misconduct . . . ." *Greenberg Traurig*, 161 S.W.3d at 98. Here, as in *Greenberg Traurig*, "the jury was allowed to draw the conclusion that the [claimants] . . . could recover for any violation by [the lawyers] . . . of the disciplinary rules, yet a violation of the disciplinary rules does not in itself give rise to civil liability against an attorney." *Id*. Hardwick was the former clients' only liability expert. *Cf. id.* at 99 ("Professor Long and former Justice Wallace were the Investors' only expert witnesses . . . ").

The impact of Hardwick's testimony is underscored by closing arguments, and by events that occurred during the jury's deliberations. The former clients' counsel relied on this testimony in urging the jury to answer "no" in response to Question 1, which asked whether Fleming and his firm complied with their fiduciary duty to the clients. Counsel stated: "Ms. Hardwick testified that the decisions made there by Mr. Fleming violated Rules 1.02, 1.03, 1.04, 1.06, 1.07 and 1.08 of the Texas Disciplinary Rules of Professional Conduct that govern us as

25

lawyers." During deliberations, the jury sent out two notes referencing Hardwick's testimony. One note asked: ". . . [M]ay we have copies of the rules of professional conduct – 1.08 (Rules of Aggregate Settlement.) Also – 1.02, 1.03, 1.04, 1.06, 1.07, 1.14." The trial court responded: "The rules were not admitted into evidence." In a second note, the jury asked to see "Lillian Hardwick's testimony regarding the rules applying to conflicts of interest."

These circumstances make the following observation from *Greenberg Traurig* equally pertinent in this case: "The potential prejudicial effect of an attorney testifying as an expert is of greater significance than that of other experts." *Greenberg Traurig*, 161 S.W.3d at 99 (citing *Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988)). "By permitting attorneys to state opinions as to what the applicable law is, the trial judge voluntarily allows his role as the expert in the courtroom to be usurped or diminished by the testifying attorney." *Greenberg Traurig*, 161 S.W.3d at 99. Even greater impact is likely when the testifying attorney describes qualifications that portray her as a trusted advisor to specific members of the Texas Supreme Court with respect to the disciplinary rules being discussed. *Cf. id.* ("These concerns are magnified when the expert witnesses are not merely practicing attorneys in a given area of the law, but are cloaked with the authority associated with being a learned legal scholar, a law school professor, or a former supreme court justice.").

Based on these circumstances, we conclude that the erroneous admission of Hardwick's testimony as set forth above warrants reversal of the trial court's judgment. We sustain Fleming's second issue.[5]

---

[5] In light of this disposition, we do not address Fleming's third and fourth issues on appeal.

## CONCLUSION

We reverse the trial court's judgment and remand for proceedings consistent with this opinion.

/s/    William J. Boyce
Justice

Panel consists of Justices Frost, Boyce and McCally.