**Reversed and Rendered and Memorandum Opinion filed December 2, 2021.**



In The

# Fourteenth Court of Appeals

### NO. 14-20-00207-CV

## WHITE STAR PUMP COMPANY, LLC, Appellant

### V.

## ALPHA HUNTER DRILLING, LLC, Appellee

**On Appeal from the 189th District Court
Harris County, Texas
Trial Court Cause No. 2014-57416**

## MEMORANDUM OPINION

Appellant White Star Pump Company, LLC appeals from a final judgment awarding appellee Alpha Hunter Drilling, LLC damages following a jury trial. Because the economic loss rule bars Alpha Hunter's tort claim, we reverse and render a take-nothing judgment.

## BACKGROUND

Alpha Hunter is an oil and gas operator. White Star manufactures mud

pumps, which are used in oilfield drilling. Mud pumps are typically driven by large diesel engines mounted on a skid or sled. Because the mud pumps at issue in this case were intended to be used at multiple drilling sites over time, they were considered mobile pumps.

Alpha Hunter contacted White Star about the possible purchase of mud pumps and engines to power them. White Star sent a written quote offering to sell Alpha Hunter two new White Star mud pumps. Alpha Hunter accepted White Star's offer. The contracts for both mud pumps contain the same language. The contracts provide, in relevant part:

> WHITE STAR PROVIDES TWO (2) DAYS OF COMMISSIONING/TRAINING PER PUMP[.]
>
> . . . .
>
> WHITE STAR OFFERS A 24-MONTH WARRANTY FROM SHIPMENT OR 18 MONTHS FROM COMMISSIONING, WHICHEVER COMES FIRST[.]
>
> . . . .
>
> NO TERMS OR CONDITIONS, OTHER THAN THOSE STATED HEREIN, AND NO AGREEMENT OR UNDERSTANDING, ORAL OR WRITTEN, IN ANY WAY PURPORTING TO MODIFY THESE TERMS AND CONDITIONS, WHETHER CONTAINED IN BUYER'S PURCHASE OR SHIPPING RELEASE FORMS, OR ELSEWHERE, SHALL BE BINDING ON SELLER AND ANY SUCH ATTEMPTED MODIFICATIONS ARE HEREBY REJECTED BY SELLER. ALL PROPOSALS, NEGOTIATIONS, AND REPRESENTATIONS, IF ANY, MADE PRIOR, AND WITH REFERENCE HERETO, ARE MERGED HEREIN.
>
> . . . .
>
> THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THE DESCRIPTION ON THE FACE HEREOF. THIS WARRANTY IS GIVEN EXPRESSLY AND IN PLACE OF ALL OTHER EXPRESS OR IMPLIED WARRANTIES AND ALL IMPLIED WARRANTIES FOR MERCHANTABILITY AND FITNESS FOR

2

A PARTICULAR PURPOSE ARE DISCLAIMED.

. . . .

In the event any goods manufactured by Seller and furnished hereunder are found to be defective or otherwise fail to conform to the conditions of this contract, Seller will, at its option, either (1) replace the goods at the delivery point specified herein, (2) repair the goods, or (3) refund the purchase price. Buyer's remedies with respect to goods manufactured by Seller and furnished hereunder that are found to be defective or otherwise not in conformity with the contract shall be limited exclusively to the right to have said goods replaced, repaired, or to a refund of the purchase price, at Seller's option. Buyer's remedies with respect to goods manufactured by others and furnished hereunder that are found to be defective or otherwise not in conformity with the contract are limited to any warranties extended and honored by the manufacturer. Buyer's remedies are limited as aforesaid regardless of whether Buyer's claim is based on principles of contract or tort. Claims must be made promptly following delivery of the goods to buyer, but within one year from date of tender of delivery. Seller must be given a reasonable opportunity to investigate.

NEITHER SELLER NOR THE MANUFACTURER SHALL HAVE ANY LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL, OR OTHER CLAIMS FROM ANY BREACH OF CONTRACT OR TORT COMMITTED BY SELLER OR THE MANUFACTURER OF GOODS RESOLD BY SELLER. Buyer agrees that it is to be solely responsible for, and will hold Seller, and the manufacturer of any goods resold by Seller, harmless from any claims, regardless of their basis, by Buyer or third parties that may arise from the goods after delivery, except for replacement, repair, or refund of the purchase price, at Seller's option, for Seller's manufactured goods or as provided in any warranties extended and honored by the manufacturer on goods manufactured by others as provided above. Seller's total cumulative liability in any way arising from or pertaining to any products sold or required to be sold under this contract, shall not in any case exceed the purchase price paid by Buyer for such product.

With respect to any work performed on goods furnished by Buyer (including but not limited to repairing, welding, machining, fabricating, heat treating, and forging) Seller agrees to make every

effort to perform fully such work in accordance with Buyer's specifications. Seller shall be responsible for damages to such goods caused only by Seller's negligence, in which case Buyer's remedy shall be limited exclusively to the price of the work to be performed by Seller on the article damaged. Claims must be made promptly following delivery of the goods to Buyer, but within three months from the date the same is put into operation and, in any event, not later than one year after date of tender of delivery. Seller must be given a reasonable opportunity to investigate. Seller shall have no liability for special, indirect, consequential, incidental or other damages arising from any breach of contract or tort.

. . . .

THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THE DESCRIPTION ON THE FACE HEREOF. THIS WARRANTY IS GIVEN EXPRESSLY AND IN PLACE OF ALL OTHER EXPRESS OR IMPLIED WARRANTIES AND ALL IMPLIED WARRANTIES FOR MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE DISCLAIMED.

Alpha Hunter purchased two unitized mud pump packages, each consisting of a mud pump, a diesel engine, and additional necessary components. Each package was mounted on two skids. Alpha Hunter used the mud pumps, called Mud Pump 1 and Mud Pump 2, at a drilling site in Ohio. Mud Pump 2 forms the basis of Alpha Hunter's claims in this case. As part of the sale, White Star provided two mud pump hands to assist Alpha Hunter's employees in the commissioning, setup, monitoring, servicing, and repairing of the equipment.

The sale of mud pumps such as White Star's requires a testing or commissioning period to ensure that the machinery functions as intended. During commissioning, the manufacturer or supplier of a product sends personnel to the purchaser to train the purchaser's employees on how to safely operate the machinery and also remain on site to provide any support that might be necessary. The commissioning period can range from a few hours to several weeks depending

on the application, the type of equipment, the experience of the purchaser, the type of well, and what happens at the drilling site during the commissioning period.[1] For example, Schramm sold the drilling rig used at the Ohio drilling site to Alpha Hunter. Schramm provided an employee, Daniel Gallagher, to assist Alpha Hunter with the commissioning of the rig. Gallagher provided training and anything else Alpha Hunter asked him to do to make certain the rig ran correctly, and that Alpha Hunter was successful. According to Gallagher, commissioning of a drilling rig can run anywhere from one to six months, but he was present at Alpha Hunter's Ohio drilling site for nine months. In addition, Gallagher testified that it was typical for Schramm to send personnel to a site to cover the entire warranty period.

White Star delivered the mud pumps and engines and initially set them up for a test run at Schramm's rigging yard. Once the drilling rig and all associated equipment, including the mud pumps, had been tested at the rigging yard, Alpha Hunter accepted the mud pump packages and they were moved to the drilling site in Ohio. Alpha Hunter asked White Star, as part of the commissioning process, to send some of their people to the Ohio drilling site to assist Alpha Hunter with the mud pumps. According to David Evans, Alpha Hunter's rig manager on the Ohio drilling rig, White Star personnel were supposed to stay at the drilling site "during the whole first well to make sure the pumps performed like they were supposed to." While White Star provided two hands on the drilling site, the drilling controls, including the controls for operating the mud pumps, were located in the drilling house.[2] Evans explained that this was necessary because the Alpha Hunter "driller

---

[1] David Cason, a drilling superintendent for Alpha Hunter, testified that commissioning normally takes four to eight hours. He recognized however, that the length of a commissioning "just depends, depends on what you find. I mean, if everything goes smooth for the first four hours, you might be okay and stop there. But, if you've had any kind of hiccup, you might want to see what caused it and just continue with the test."

[2] The drilling house is where the drilling operator runs the rig. In Texas, the drilling

5

needs complete control."

White Star sent two hands, Adam Schafer and Paul Tweddle, to assist Alpha Hunter's employees in Ohio. They were to perform maintenance on the mud pumps and assist Alpha Hunter in the operation of the mud pumps during commissioning of the pumps at the drill site. Mike Rogers, Alpha Hunter's vice president of operations, testified that White Star told him the White Star hands would stay for 10 to 12 days to make sure the mud pumps operated effectively and up to par on what Alpha Hunter expected. Schafer worked the 12-hour night shift, and Tweddle worked the 12-hour day shift.

Gallagher testified that it was his understanding that the White Star personnel were at the drilling site to "provide commissioning support for the mud pumps." Tweddle testified that he would not consider a commissioning complete unless he was satisfied that everything had been set up correctly and the mud pumps were operating properly. Rogers testified that there is a commissioning period and normally, when all goes well, somebody declares everything is good and the commissioning phase ends. Rogers then testified that they did not reach that point with the White Star mud pumps at issue here. In addition to the commissioning activities, according to Tweddle, White Star provided a few weeks of training as part of the mud pump packages Alpha Hunter purchased.

The White Star mud pumps began experiencing problems immediately once they were put into service at the drilling site on July 17, 2013. The mud pumps were "jacking" and "cavitating," which are industry terms generally describing vibration caused by several factors, such as insufficient mud fluid pressure, an

---

house is called the doghouse. Alpha Hunter asked for mud pump controls to be installed in the drilling house so the drilling operator could control the mud pumps. Schramm installed those controls.

uneven foundation supporting the mud pumps, or a lack of mud pump control in the drilling house. Cavitating and jacking are serious problems, and the White Star mud pump hands worked with Alpha Hunter to manage them. Tweddle testified that he reported the problems to Alpha Hunter, but they would come over to the mud pump, listen, and then do nothing because, in their view, there was nothing wrong. Tweddle continued that all he could do was monitor the situation and advise Alpha Hunter because the Alpha Hunter driller was the "only person on that rig who can shut that [mud] pump down."

On August 8, 2013, Mud Pump 2's engine exploded. It is undisputed that no one was injured from the explosion and the only damage that occurred was to Mud Pump 2's engine that had been supplied by White Star pursuant to the contract. Prior to the explosion, Tweddle arrived in the morning and spoke with the drilling house crew for less than an hour. One of the subjects discussed was the cavitation and jacking the pumps were experiencing and what Tweddle thought they should do about it. Tweddle testified that he believed the explosion was attributable to three things: (1) a lack of interest by Alpha Hunter employees in training and maintenance; (2) frequent instances of cavitation and jacking coupled with a tepid reaction by the Alpha Hunter tool personnel in charge; and (3) uneven and poorly constructed rig flooring and matting, which created an uneven floor for the sleds holding the two mud pump packages.

White Star sent its vice president of engineering, Peter Wan, to investigate the cause of the explosion. Alpha Hunter conducted an internal investigation and employed outside consultants to render their opinion about why the incident occurred. White Star's investigation of the explosion concluded that it was a result of (1) Alpha Hunter's incompetence and refusal to heed warnings or properly run the mud pumps, and (2) a defective control system requested by Alpha Hunter and

7

installed by Schramm. Both of Alpha Hunter's testifying experts told the jury that the cause of the accident was a lack of rubber mounts, a deficiency that existed when the mud pump packages left White Star's facility.

After the explosion, Alpha Hunter submitted a warranty claim to White Star. In response, White Star offered to repair or replace the damaged equipment if Alpha Hunter fronted the cost of the replacement part pending the completion of the investigations into the explosion. In addition, White Star offered to reimburse Alpha Hunter that amount if the investigation established White Star was responsible for the explosion. Alpha Hunter refused White Star's proposal.

Alpha Hunter eventually filed suit against White Star alleging causes of action for breach of contract/warranty, fraud, and negligent undertaking. After a lengthy trial, the jury found that White Star failed to provide Alpha Hunter with non-defective equipment. The jury then rejected Alpha Hunter's contract/warranty claim, when it refused to find that White Star had "failed, at its election, to either repair, replace, or refund the purchase price of the Equipment" to Alpha Hunter. The jury also rejected Alpha Hunter's fraud claim. The jury, however, found that White Star was liable under a negligent-undertaking theory. The jury found that Alpha Hunter's damages were approximately $1.6 million under the negligent-undertaking cause of action for the market value of the pump and the loss of use of the pump. The jury also found that Alpha Hunter was 35% responsible. The trial court signed a final judgment based on the jury's verdict. This appeal followed.

## ANALYSIS

Alpha Hunter filed suit against White Star alleging causes of action for breach of contract/warranty, fraud, and negligent undertaking. The jury rejected all of Alpha Hunter's claims except the negligent undertaking claim. On appeal, White Star raises two issues challenging the trial court's negligent undertaking

8

judgment against it.

In its first issue on appeal White Star asserts that the trial court erred when it signed the judgment against it because the economic loss rule bars any recovery under Alpha Hunter's negligent undertaking claim. Focusing exclusively on the contract's language that White Star would provide two days of commissioning support to Alpha Hunter, Alpha Hunter argues the purchase contract had been completed, and White Star voluntarily assumed a new legal duty, separate and apart from the previously existing contractual duties, to "monitor, maintain, and service the Mud Pumps on Rig No. 7 in a reasonable and prudent manner."

The economic loss rule addresses the use of negligence claims as a vehicle to recover economic losses. *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 415 (Tex. 2011). "The economic loss rule generally precludes recovery in tort for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy." *Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014) (per curiam). More specifically, "the economic loss rule forecloses strict liability claims based on a defective product that damages only itself but not other property." *Barzoukas v. Foundation Design, Ltd.*, 363 S.W.3d 829, 834 (Tex. App.—Houston [14th Dist.] 2012, pet. denied). The rule "also forecloses a negligence claim predicated on a duty created under a contract to which the plaintiff is a party when tort damages are sought for an injury consisting only of economic loss to the subject of the contract." *Id.* at 835. But the economic loss rule does not bar all claims arising out of a contractual setting, and a party cannot "avoid tort liability to the world simply by entering into a contract with one party." *Id.* If that was the case, "the economic loss rule [would] swallow all claims between contractual and commercial strangers." *Id*. Specifically, a party

states a tort claim which is not barred by the economic loss rule "when the duty allegedly breached is independent of the contractual undertaking **and** the harm suffered is not merely the economic loss of a contractual benefit." *Chapman Custom Homes, Inc.*, 445 S.W.3d at 718. (emphasis added). Stated another way, the rule precludes recovery of economic losses in negligence when the loss is the subject matter of a contract between the parties. *Coastal Conduit & Ditching, Inc. v. Noram Energy Corp.*, 29 S.W.3d 282, 285 (Tex. App.—Houston [14th Dist.] 2000, no pet.). While the rule has sometimes been described as "murky," the Texas Supreme Court has stated that it is "fairly clear" under Texas law, "that one party to a contract cannot recover from another party, in an action for negligence, an economic loss to the subject of the contract." *LAN/STV v. Martin K. Eby Const. Co., Inc.*, 435 S.W.3d 234, 242 (Tex. 2014). The rule reflects a determination that economic losses in these contexts "are more appropriately addressed through statutory warranty actions or common law breach of contract suits." *Fleming v. Kinney*, 395 S.W.3d 917, 923 (Tex. App.—Houston [14th Dist.] 2013, pet. denied).

Here, there is no dispute that Alpha Hunter directly contracted with White Star for the purchase of the two mud pumps and two diesel engines to power them. There is also no dispute that the damage Alpha Hunter sustained was exclusively to one of the diesel engines White Star sold Alpha Hunter. The evidence is also undisputed that no drilling-site personnel were injured because of the explosion. As a result, the economic loss rule bars any recovery by Alpha Hunter under its negligent undertaking theory. *See LAN/STV*, 435 S.W.3d at 236 ("We conclude that the economic loss rule does not allow recovery and accordingly reverse the judgment of the court of appeals and render judgment for the architect."); *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986) ("When the injury is only the economic loss to the subject of a contract itself, the action sounds in

10

contract alone."); *Mid-Continent Aircraft Corp. v. Curry Cty. Spraying Servs., Inc.*, 572 S.W.2d 308, 313 (Tex. 1978) ("In transactions between a commercial seller and commercial buyer, when no physical injury has occurred to persons or other property, injury to the defective product itself is an economic loss governed by the Uniform Commercial Code."); *Hou-Tex, Inc. v. Landmark Graphics*, 26 S.W.3d 103, 107 (Tex. App.—Houston [14th Dist.] 2000, no pet.) ("In this case, the fact of most import is that Hou-Tex suffered only economic damages for its cost of drilling a dry well. Given this fact, we hold that the economic loss rule precludes any duty in tort by Landmark to Hou-Tex."); *cf. Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837–39 (Tex. 2000) (negligent undertaking case where it was alleged that a defective product caused the death of two U.S. Marines and there was no contractual privity between parties).

Alpha Hunter's argument in response does not change this result. Alpha Hunter's entire argument that the economic loss rule does not apply is based on its contention that White Star's activities at the drilling site were "wholly removed from the framework and context of the Contract" and the activities "gave rise to a tort claim that was distinct and separate from any contract claims." In making this argument, Alpha Hunter focuses entirely on only one part of the contract, the provision limiting White Star's commissioning and training commitment to a maximum of two days per pump. Alpha Hunter also overlooks the second part of the economic loss rule which disallows tort recovery when the harm suffered is limited to the economic loss of a contractual benefit. *See LAN/STV*, 435 S.W.3d at 242 ("It was also fairly clear that one party to a contract cannot recover from another party, in an action for negligence, an economic loss to the subject of the contract."); *Barzoukas*, 363 S.W.3d at 835. In that situation, the plaintiff is limited to a breach of contract or warranty action. *See LAN/STV*, 435 S.W.3d at 242.

11

("Recovery of such damages must be for breach of contract or warranty.").

When construing a contract, we may not limit our review to only one part of the contract. Instead, when construing a written contract, our primary goal is to ascertain the true intentions of the parties as expressed in the instrument. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). We give contract terms their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). We construe contracts from a utilitarian standpoint, bearing in mind the particular business activity sought to be served, and we avoid, when possible and proper, a construction that is unreasonable, inequitable, or oppressive. *Frost Nat'l Bank v. L & F Distrib., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005). Courts are not authorized to rewrite agreements to insert additional provisions the parties could have included, or to remove provisions that the parties, for whatever reason, would prefer to ignore. *Tenneco, Inc. v. Enterprise Prod. Co.*, 925 S.W.2d 640, 646 (Tex. 1996). In other words, courts cannot make, or remake, contracts for the parties. *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 888 (Tex. 1998). When a contract is unambiguous, a reviewing court construes it as a matter of law.[3] *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003).

Even if we accept Alpha Hunter's contention that White Star's commissioning and training activities ceased two days after each mud pump began operating at the drilling site, the contract still controls because there are other provisions in the contract explaining the presence and activities of the two White Star technicians at the drilling site beyond the commissioning and training period. *See Chapman Custom Homes, Inc.*, 445 S.W.3d at 718 ("A party states a tort claim

---

[3] Neither party argues that the contract at issue was ambiguous. We conclude it is not.

12

when the duty allegedly breached is independent of the contractual undertaking and the harm suffered is not merely the economic loss of a contractual benefit."); *Houston Metro Ortho and Spine Surgery, LLC v. Juansrich, Ltd.*, No. 14-19-00732-CV, 2021 WL 2799643, at *5 (Tex. App.—Houston [14th Dist.] July 6, 2021, pet. filed) ("The LLC Agreement covers the field of this dispute. It created Juansrich's ownership interest, defined the parties' rights and duties under the agreement, and established the remedies available when a party failed to perform those duties."). In addition to the two days of commissioning and training per pump, the contract provided for an express warranty of a maximum of 24-months from the shipping date for White Star, at its option, to repair, replace, or refund the purchase price of any defective mud pump.[4] The contract also gave White Star the right to a reasonable opportunity to investigate any problems with the mud pumps. Finally, it limited any damages caused by White Star's repair work to the price of the work. In addition, the contract did not limit White Star's discretion in how it would exercise those contractual rights. The fact that White Star, faced with a warranty on two mud pumps experiencing problems from the start of their operation at the drilling site, decided to keep two technicians on the scene to make warranty repairs and observe the operations of the mud pumps, as the contract allowed and was in line with industry practice, does not mean White Star embarked on a voluntary assumption of a new duty outside the framework of its contract with Alpha Hunter. *See Houston Metro Ortho and Spine Surgery, LLC*, 2021 WL 2799643, at *6 (rejecting tort claim because "the LLC Agreement covers all aspects of Juansrich's unjust enrichment claim."); *Zurich Am. Ins. Co. v. Certain Underwriters*, No. 01-19-00184-CV, 2020 WL 5048141, at *9 (Tex. App.—Houston [1st Dist.] Aug. 27, 2020, pet. filed) ("Court's construe contracts

---

[4] The contract provided for either a 24-month warranty from the shipping date, or an 18-month warranty from the date of commissioning, whichever came first.

in accordance with the custom and practices of the industry and locale to which those contracts relate.)"

Because the contract authorized White Star's drilling site activities and the only loss Alpha Hunter experienced was damage to the subject of the contract, we hold that the economic loss rule bars Alpha Hunter's negligent undertaking recovery. We sustain White Star's first issue on appeal.

## CONCLUSION

Having sustained White Star's first issue on appeal, we reverse the trial court's judgment and render judgment that Alpha Hunter take nothing on its causes of action against White Star.[5]

/s/ Jerry Zimmerer
   Justice

Panel consists of Justices Wise, Bourliot, and Zimmerer.

---

[5] Because we have sustained White Star's first issue which resolves the appeal, we need not reach White Star's second issue on appeal. Tex. R. App. P. 47.1.