REVISED NOVEMBER 17, 2009

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 30, 2009

Charles R. Fulbruge III
Clerk

No. 08-20398

In The Matter Of: PROEDUCATION INTERNATIONAL INC, doing business as ProEducation Support Services, doing business as Data Dynamics Inc, doing business as ProEd Venture LLC

                                        Debtor

_____

KIRK ALLEN KENNEDY; MARK D'ANDREA

                          Appellants-Cross-Appellees

v.

MINDPRINT

                          Appellee-Cross-Appellant

_____

Appeal from the United States District Court
for the Southern District of Texas, Houston

_____

Before KING, DAVIS, and BENAVIDES, Circuit Judges.

KING, Circuit Judge:

Kirk A. Kennedy, an attorney, was an associate in the law firm of Jackson Walker L.L.P. from February 2003 to November 2004. Another Jackson Walker attorney, Lionel Schooler, had been representing MindPrint, Inc., a creditor in the bankruptcy proceeding of ProEducation International, Inc., since 1999.

Kennedy had no knowledge of or involvement with MindPrint while at Jackson Walker. In September 2006, Kennedy entered an appearance on behalf of Dr. Mark D'Andrea, a creditor in the ProEducation proceeding. Upon motion by MindPrint, the bankruptcy court disqualified Kennedy based on an imputed conflict of interest but declined to impose monetary sanctions. The district court affirmed the bankruptcy court on both issues. Kennedy appeals the disqualification order and MindPrint cross-appeals the denial of monetary sanctions. For the following reasons, we REVERSE the disqualification order.

## I. BACKGROUND

### A. Factual Background

Attorney Kirk A. Kennedy seeks to represent Dr. Mark D'Andrea in his efforts to collect a judgment from ProEducation International, Inc. (ProEducation). Kennedy worked in the bankruptcy section of the Houston firm of Jackson Walker L.L.P. from February 2003 to November 2004. His office was located down the hall from Lionel Schooler, who also worked in the bankruptcy section. Unbeknownst to Kennedy, since 1999 Schooler had been representing MindPrint, Inc. (MindPrint) in a state court case against ProEducation. Several shareholders of ProEducation, including D'Andrea, intervened in the state court suit and took positions adverse to MindPrint. In November 2000, during the pendency of the state court case, ProEducation filed for Chapter 7 bankruptcy. The state court case was removed to bankruptcy court as an adversary proceeding shortly thereafter. Schooler continued to represent MindPrint throughout the adversary proceeding and in all matters pertaining to the ProEducation bankruptcy. D'Andrea was represented in the adversary proceeding by attorney Tom Schmidt.

While Kennedy worked at Jackson Walker, Schooler provided legal services to MindPrint in connection with the bankruptcy case and the adversary proceeding. At the conclusion of the adversary proceeding in July 2005, the

bankruptcy court entered judgment in favor of both MindPrint and the shareholders (including D'Andrea) against ProEducation. MindPrint moved for sanctions against the shareholders, which the bankruptcy court denied. MindPrint appealed the denial of sanctions.

After Kennedy left Jackson Walker in November 2004, the Gulf Coast Cancer Center—where D'Andrea works as medical director—hired Kennedy as general counsel. In November 2005, during the appeal from the denial of sanctions in the adversary proceeding, Schmidt informed Schooler that he was planning to withdraw from representing D'Andrea and that Kennedy would replace him. MindPrint objected to Kennedy's involvement because of his previous association with Jackson Walker. Kennedy did not officially enter an appearance as D'Andrea's attorney at this point; but despite MindPrint's objections, Kennedy contributed to a brief filed on D'Andrea's behalf.

In July 2006, MindPrint discovered that Kennedy was attempting to conduct discovery about the appeal from the adversary proceeding. Schooler emailed Kennedy on two occasions, objecting to his representation of D'Andrea on the ground of imputed conflict of interest. Kennedy did not respond to either email, and he continued to work on behalf of D'Andrea in his collection efforts and in the appeal. On September 29, 2006, Kennedy filed a notice to appear on behalf of D'Andrea in the main bankruptcy case.

## B. Procedural Background

In October 2006, MindPrint moved to disqualify Kennedy from representing D'Andrea in the bankruptcy case and in the appeal. The bankruptcy court granted MindPrint's motion to disqualify but did not award any monetary sanctions. The bankruptcy court found that Jackson Walker's "knowledge of MindPrint's client confidences extends to former employees." Relying on In re American Airlines, Inc., 972 F.2d 605, 614 & n.1 (5th Cir. 1992), and Kraft, Inc. v. Alton Box Board Co. (In re Corrugated Container Antitrust

Litigation), 659 F.2d 1341, 1346 (5th Cir. 1981), the bankruptcy court applied two irrebuttable presumptions: first, "confidential information has been given to the attorney actually doing work for the client," and second, "confidences obtained by an individual lawyer will be shared with the other members of his firm." The bankruptcy court did not allow Kennedy to attempt to rebut the second presumption, relying on American Can Co. v. Citrus Feed Co., 436 F.2d 1125, 1129 (5th Cir. 1971), for the proposition that "in the Fifth Circuit, liability for disqualification extends to former employees of the attorney who established the attorney–client relationship." Noting that "disqualification alone is a sanction," the bankruptcy court did not award monetary sanctions against Kennedy or D'Andrea.

After distribution of the bankruptcy estate, Kennedy appealed the disqualification order to the district court, and MindPrint cross-appealed on the issue of monetary sanctions. The district court affirmed the order on both issues. This appeal was timely filed, and we have jurisdiction under 28 U.S.C. §§ 158(d) and 1291.[1]

## II. STANDARD OF REVIEW

---

[1] During the pendency of this appeal, MindPrint advised the court by letter that pleadings filed in a Harris County lawsuit indicate that Kennedy no longer works for Gulf Coast Cancer Center and is currently "at odds" with D'Andrea—indicating that D'Andrea "no longer has an interest in employing Kennedy as his attorney." MindPrint suggests the appeal from the disqualification order should be dismissed as moot. However, an attorney's right to defend his or her professional reputation confers Article III jurisdiction for purposes of appeal. See Walker v. City of Mesquite, 129 F.3d 831, 832–33 (5th Cir. 1997) (finding jurisdiction over attorney's appeal of sanctions order because "the importance of an attorney's professional reputation, and the imperative to defend it when necessary, obviates the need for a finding of monetary liability or other punishment as a requisite for the appeal of a court order finding professional misconduct"). This rule has been applied to allow appeal of a disqualification order even after accompanying monetary sanctions have been paid. Ibarra v. Baker, Nos. 08–20220, 08–20276, 2009 WL 2244659, at *1 (5th Cir. July 28, 2009) (stating that "attorneys' concern about their reputation suffices to confer Article III jurisdiction" and finding jurisdiction over appeals from disqualification orders even "though the attorneys' monetary sanctions have been paid"). In addition, MindPrint's pursuit of the sanctions cross-appeal requires a decision on the correctness of the disqualification order. Therefore, the disqualification appeal is not moot.

When a court of appeals "review[s] the decision of a district court, sitting as an appellate court, [it] appl[ies] the same standards of review to the bankruptcy court's findings of fact and conclusions of law as applied by the district court." Caillouet v. First Bank & Trust (In re Entringer Bakeries, Inc.), 548 F.3d 344, 348 (5th Cir. 2008) (per curiam). The standard of review for a grant or denial of a motion to disqualify counsel is abuse of discretion; however, "in applying this standard, we will review fact-findings for clear error, and we will perform a careful examination, or de novo review, of the [lower] court's application of the relevant rules of attorney conduct." FDIC v. U.S. Fire Ins. Co., 50 F.3d 1304, 1311 (5th Cir. 1995) (internal quotation marks omitted).

## III. DISCUSSION

### A. Disqualification

#### 1. Choice of Law

When considering motions to disqualify, courts should first look to "the local rules promulgated by the local court itself." U.S. Fire Ins., 50 F.3d at 1312. The Local Rules of the Southern District of Texas provide that "the minimum standard of practice shall be the Texas Disciplinary Rules of Professional Conduct" (Texas Rules), and that violations of the Texas Rules "shall be grounds for disciplinary action, but the court is not limited by that code." S.D. TEX. LOCAL R. APP. A, R. 1A & 1B. Therefore, the Texas Rules "are not the sole authority governing a motion to disqualify." In re Am. Airlines, 972 F.2d at 610 (internal quotation marks omitted). A reviewing court also "consider[s] the motion governed by the ethical rules announced by the national profession in light of the public interest and the litigants' rights." Id. The Fifth Circuit has recognized the ABA Model Rules of Professional Conduct (Model Rules) as the national standards to consider in reviewing motions to disqualify. Id. Therefore, we shall consider both the Texas Rules and the Model Rules.

#### 2. Applicable Standards

The Fifth Circuit's approach to ethical issues has remained "sensitive to preventing conflicts of interest." Id. at 611. Under this approach, a "[d]istrict [c]ourt is obliged to take measures against unethical conduct occurring in connection with any proceeding before it." Id. (emphasis and alterations in original; internal quotation marks omitted). Yet, "[d]epriving a party of the right to be represented by the attorney of his or her choice is a penalty that must not be imposed without careful consideration." U.S. Fire Ins., 50 F.2d at 1313. Because of the severity of disqualification, we do not apply disqualification rules "mechanically," but we consider "[a]ll of the facts particular to [the] case . . . in the context of the relevant ethical criteria and with meticulous deference to the litigant's rights." Id. at 1314 (citing Church of Scientology of Cal. v. McLean, 615 F.2d 691, 693 (5th Cir. 1980)). Stated plainly, this sanction "must not be imposed cavalierly." Id. at 1316.

Texas Rule 1.09 states:

(a) Without prior consent, a lawyer who personally has formerly represented a client in a matter shall not thereafter represent another person in a matter adverse to the former client:

> (1) in which such other person questions the validity of the lawyer's services or work product for the former client;

> (2) if the representation in reasonable probability will involve a violation of Rule 1.05 [dealing with confidential client information]; or

> (3) if it is the same or a substantially related matter.

(b) Except to the extent authorized by Rule 1.10, when lawyers are or have become members of or associated with a firm, none of them shall knowingly represent a client if any one of them practicing alone would be prohibited from doing so by paragraph (a).

(c) When the association of a lawyer with a firm has terminated, the lawyers who were then associated with that lawyer shall not knowingly represent a client if the lawyer whose association with that firm has terminated would be prohibited from doing so by

paragraph (a)(1) or if the representation in reasonable probability
will involve a violation of Rule 1.05.

TEX. DISCIPLINARY R. PROF'L CONDUCT 1.09, reprinted in TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A, Art. 10, § 9 (Vernon 2005).[2]  Under Texas Rule 1.09(b), the personal conflicts of one attorney are imputed to all other members of a firm. Id. 1.09(b).  Comment 7 to Rule 1.09 states that this imputation can be removed when an attorney leaves a firm, stating that "should . . . other lawyers cease to be members of the same firm as the lawyer affected by paragraph (a) without personally coming within its restrictions, they thereafter may undertake the representation against the lawyer's former client unless prevented from doing so by some other of these Rules."  See id. 1.09 cmt. 7 (emphasis added).  The Texas Rules and the accompanying comments do not expressly describe the burden of proof or who bears the burden on the issue of whether a lawyer personally came within the restrictions of Rule 1.09(a).  The Texas Supreme Court has not yet addressed the application of Texas Rule 1.09 to this precise fact pattern.[3]

The relevant Model Rule, Rule 1.9(b), uses slightly different language than the Texas Rule:

---

[2] The current version of the Texas Rules became effective January 1, 1990.  See Clarke v. Ruffino, 819 S.W.2d 947, 949 (Tex. App.—Houston [14th Dist.] 1991, writ dism'd w.o.j.).

[3] The Texas Supreme Court has addressed Rule 1.09 in other contexts.  See, e.g., In re Basco, 221 S.W.3d 637, 639 (Tex. 2007) (disqualifying attorney on grounds he would criticize former partner's work in underlying action, not on grounds of imputed knowledge); In re Mitcham, 133 S.W.3d 274, 276–77 (Tex. 2004) (disqualifying attorney's new firm for violating confidentiality agreement, not on grounds of imputed knowledge); Henderson v. Floyd, 891 S.W.2d 252, 254 (Tex. 1995) (disqualifying departing attorney where he was "at least exposed to confidential information" regarding client).  MindPrint relies on National Medical Enterprises, Inc. v. Godbey, 924 S.W.2d 123 (Tex. 1996), for the proposition that knowledge is imputed from one attorney to all members of his firm; however, Godbey did not address the migrating attorney scenario.  Id. at 131 (discussing only how an "attorney's knowledge is imputed by law to every other attorney in the firm" and not reaching whether imputed disqualification can be removed after an attorney leaves a firm without personally representing a client or gaining confidential information).

> A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client (1) whose interests are materially adverse to that person; and (2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter; unless the former client gives informed consent, confirmed in writing.

MODEL RULES OF PROF'L CONDUCT R. 1.9(b) (2006).  Regardless of linguistic differences, the two codes produce the same result in application—they both require that a departing lawyer must have actually acquired confidential information about the former firm's client or personally represented the former client to remain under imputed disqualification.[4]  See Amon Burton, Migratory Lawyers and Imputed Conflicts of Interest, 16 REV. LITIG. 665, 677, 684–85 (1997) (applying both Texas Rule 1.09 and Model Rule 1.9(b) and reaching the same conclusion—"the transferring lawyer is no longer deemed to have imputed knowledge about his former firm's client").  Comment 6 to Model Rule 1.9(b) states that the "[a]pplication of paragraph (b) depends on a situation's particular facts," and places the burden of proof upon "the firm [or attorney] whose disqualification is sought."  MODEL RULES OF PROF'L CONDUCT R. 1.9 cmt. 6.

Although the Texas Supreme Court has yet to expressly address this fact pattern, the Texas Commission on Professional Ethics has published an opinion explicating the impact of Texas Rule 1.09 on this precise issue.  See Tex. Comm.

---

[4] The Restatement (Third) of The Law Governing Lawyers also produces the same result and is more clearly worded.  "[A] lawyer who has represented a client in a matter may not thereafter represent another client in the same or a substantially related matter in which the interests of the former client are materially adverse."  RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 132 (2000).  This prohibition is imputed to other members of a law firm under § 123, and the provisions for removing this imputation are laid out under § 124.  Id. §§ 123, 124.  The comments to § 124 explicitly state that "[w]hen a lawyer leaves a firm or other organization whose lawyers were subject to imputed prohibition owing to presence in the firm of another lawyer, the departed lawyer becomes free of imputation so long as that lawyer obtained no material confidential client information relevant to the matter."  Id. § 124 cmt. c(ii).

on Prof'l Ethics, Formal Op. 501 (1994). The opinion addresses the following hypothetical:

> [Attorney C] was associated with Attorney A in Law Firm ABC [and] leaves that firm to establish or join a different law firm and now the lawyer that left (Attorney C) desires to represent [a husband in a divorce proceeding; however,] Attorney A formerly represented or consulted with [the wife] when Attorney A and Attorney C were in the same law firm.

Id. The Opinion identifies the last sentence of Comment 7 to Texas Rule 1.09 as the controlling law, and it concludes that "if Attorney C . . . does not personally come within the provisions of [Texas Rule] 1.09(a), he will not [be] deemed to be vicariously 'contaminated' by Attorney A's prior representation or consultation with [the wife]."[5] Id.

Commentators have also interpreted Texas Rule 1.09 to allow migrating lawyers to remove imputation in the absence of a personal representation or acquisition of confidential information. Amon Burton, an Adjunct Professor at the University of Texas School of Law, describes the current version of the Texas Rules as "unquestionably limit[ing] the scope of imputed knowledge after lawyers are no longer associated" with a firm. Burton, supra, at 702 (tracing

---

[5] Contra Tex. Comm. on Prof'l Ethics, Formal Op. 453 (1987) (applying superseded version of Texas Rules). Ethics Opinion 453 asked:
> May an associate attorney of law firm A engage in employment discussions with law firm B, while law firm A represents X, which is in litigation with Y, represented by law firm B, where the associate and the partner for whom he worked in law firm A have done no work for X and have no actual knowledge of any matter pertaining to X?

Id. The question was resolved as follows:
> While the associate was employed by law firm A, he as well as every other member of law firm A was disqualified from accepting employment against that firm's client, X. The associate's disqualification would not end upon his leaving law firm A, so he would be disqualified from representing Y, the client of law firm B, in a suit against X.

Id. "The standard for imputed disqualification [applied in Ethics Opinion 453] is not the same as set forth in Rule 1.09 of the [current] Texas Disciplinary Rules." Burton, supra, at 690 (emphasis added).

evolution of Texas ethics rules).  Particularly, "[t]here is ample justification in [this] situation[] to permit a lawyer who was formerly affiliated with a personally disqualified lawyer to rebut a presumption that he or she has a conflict of interest or possesses material confidential information as a result of the former association."  Id. at 703. Prof. Burton notes that the danger to a client—here, MindPrint—of revealing confidential information is "de minimis" when a lawyer seeks to establish "lack of knowledge of the client's confidential information" or that "he did not personally represent the complaining client." Id.  These considerations justify allowing a departing attorney the opportunity to remove any imputed conflict of interest.[6]  Id.

In a declaration filed with the bankruptcy court on Kennedy's behalf (albeit after the disqualification), Professor Robert Schuwerk of the University of Houston Law Center discusses the application of Texas Rule 1.09 and Comment 7 to these facts and concludes that an irrebuttable presumption that attorneys possess confidential information even after departing from a firm is "both unfair and unworkable."  Prof. Schuwerk considers the Texas Rules, the Restatement, and Fifth Circuit law in reaching the conclusion that departing attorneys have the opportunity to demonstrate that they did not personally represent or acquire information about the former firm's clients.  As applied to the facts of this case, Prof. Schuwerk opines that Kennedy's representation of D'Andrea does not constitute a conflict of interest requiring disqualification.

---

[6] The former Texas Code of Professional Responsibility was enacted in 1971 and was superseded by the current Texas Disciplinary Rules of Professional Conduct, which took effect January 1, 1990.  Burton, supra, at 690 n.87.  The current version of the Texas Rules reflects a "desire within the legal profession to eliminate or restrict imputed disqualification" and changes its stance significantly when compared to the 1971 version.  Id. at 688 n.79.  This desire is due in large part to the "development of lateral movement in the legal profession"—a "significant change from the traditional relationship between lawyers and their law firms prior to the early 1980s."  Id. at 666.  Under the 1971 version of the Texas Rules, Kennedy's representation of D'Andrea would have been barred, and Kennedy would not have the opportunity to remove the imputation.  See Tex. Comm. on Prof'l Ethics, Formal Op. 453 (1987).

Under Texas Rule 1.09(b), Kennedy was conclusively disqualified by imputation from representing D'Andrea only while he remained at Jackson Walker. When Kennedy ended his affiliation with Jackson Walker without personally acquiring confidential information about MindPrint, his imputed disqualification also ended. See TEX. DISCIPLINARY R. PROF'L CONDUCT 1.09 cmt. 7; see also Burton, supra, at 684–85 ("If the transferring lawyer did not represent the former client while at his former firm and possesses no confidential information material to the matter, the transferring lawyer is no longer deemed to have imputed knowledge about his former firm's client. Accordingly, the transferring lawyer . . . [is] entitled to accept the representation adverse to his former firm's client."). Therefore, the bankruptcy court should have considered Kennedy's evidence of his lack of involvement with MindPrint while at Jackson Walker.

The evidence reflects that while at Jackson Walker, Kennedy never personally represented MindPrint, nor did he gain any actual knowledge of MindPrint. At the evidentiary hearing before the bankruptcy court, Kennedy testified that he never heard of MindPrint while he was at Jackson Walker and that he never attended any firm meetings where the representation of MindPrint was discussed. He further testified that he had never met Al Winters, the principal of MindPrint, and that he first learned that Schooler was representing MindPrint in "May or June of 2005," about six months after he left Jackson Walker.

MindPrint did not present any evidence to contradict Kennedy's testimony. At the evidentiary hearing, Schooler attempted to exclude Kennedy's testimony regarding his lack of knowledge of MindPrint as "irrelevant" and did not present any evidence that Kennedy had personal knowledge of the case. At oral argument before the district court, Schooler was asked: "When did Kennedy have anything to do with MindPrint personally?"; he responded "I don't know that he

did," but stated that "[MindPrint's] case was discussed at a monthly bankruptcy section meeting [at Jackson Walker], which Mr. Kennedy may or may not have attended." The district court again inquired: "But at no point did Kennedy work for MindPrint while he was at Jackson Walker?" Schooler replied: "Not to my knowledge. . . . I don't know what he might have heard in the halls or what he saw in the file, but I never asked him to assist in that case." These equivocal statements were not made under oath, and even if they had been, they do not constitute affirmative evidence that Kennedy acquired material confidential information about MindPrint or Jackson Walker's representation of MindPrint. The evidence Kennedy presented was sufficient to demonstrate that he did not operate under a conflict of interest when he undertook the representation of D'Andrea.

In declining to consider Kennedy's evidence, the bankruptcy court relied on In re American Airlines, 972 F.2d at 614 n.1, for the proposition that the Fifth Circuit applies an irrebuttable presumption that "confidences obtained by an individual lawyer will be shared with other members of his firm." However, the American Airlines case did not actually involve or apply this presumption, so any statements regarding the presumption are dicta. 972 F.2d at 614 n.1 ("This presumption is not at issue in this case, for all of the [disqualified] lawyers . . . have previously represented [the client seeking disqualification]."). Furthermore, the American Airlines court cited to Corrugated Container, 659 F.2d at 1346–47, and American Can Co., 436 F.2d at 1129, in support of its use of an irrebuttable presumption; however, both of those cases applied a superseded version of the Texas Rules. The addition of Comment 7 in 1990 changed the landscape of the jurisprudence and gave migrating attorneys the opportunity to remove imputed disqualification.[7]

---

[7] It is unclear whether a rebuttable presumption replaces the American Airlines irrebuttable presumption, or whether no presumption remains. We do not reach this question,

Under both the Texas Rules and the ABA Model Rules, Kennedy should have had the opportunity to demonstrate that he did not obtain confidential information regarding MindPrint during his time at Jackson Walker. Kennedy presented uncontradicted evidence that he was unaware of MindPrint's existence—let alone Schooler's representation of MindPrint—during his affiliation with Jackson Walker. In light of this evidence, Kennedy successfully showed that his imputed disqualification ended when he left Jackson Walker; therefore, his representation of D'Andrea did not present a conflict of interest requiring his disqualification.

## B. Sanctions

A lower court's ruling on a motion for sanctions under its inherent power is reviewed for abuse of discretion. Chambers v. NASCO, Inc., 501 U.S. 32, 50 (1991). To support an award of sanctions under its inherent power, "[a] court must make a specific finding that the sanctioned party acted in bad faith." Matta v. May, 118 F.3d 410, 416 (5th Cir. 1997) (citing Dawson v. United States, 68 F.3d 886, 895 (5th Cir. 1995)). Our disposition of the disqualification issue in Kennedy's favor moots MindPrint's appeal from the bankruptcy court's decision to decline to award monetary sanctions against Kennedy and D'Andrea.

## IV. CONCLUSION

For the reasons discussed above, we REVERSE the district court's judgment affirming the bankruptcy court's order disqualifying Kennedy.

---

as Kennedy provided uncontroverted evidence that he was never involved with the representation of MindPrint and that he did not know MindPrint existed while he was at Jackson Walker. This evidence suffices to remove the imputed conflict of interest regardless of whether a rebuttable presumption remains. See Jack Cole Co. v. Hudson, 409 F.2d 188, 192 (5th Cir. 1969) (noting that a presumption will disappear if clear and undisputed evidence to the contrary is presented); see also Bonilla–Torres v. Wal-Mart Transp. LLC, 309 F. App'x 882, 883 (5th Cir. 2009) (per curiam) (citing Jack Cole for proposition that uncontradicted testimony suffices to rebut presumption outside conflict-of-interest context).

MindPrint's cross- appeal is DISMISSED. MindPrint shall bear the costs of this appeal.