**Motion for Rehearing Denied; Opinion of October 31, 2013 Withdrawn; Reversed and Remanded; and Substitute Opinion filed December 12, 2013.**



In The

# Fourteenth Court of Appeals

### NO. 14-12-00494-CV

**MARK A. D'ANDREA, M.D., GULF COAST CANCER & DIAGNOSTIC CENTER OF SOUTHEAST, INC., GULF COAST ONCOLOGY ASSOCIATES, P.A., UNIVERSITY CENTER HUNTSVILLE-BRENHAM, INC. AND SOUTHEAST GULF COAST BUSINESS DEVELOPMENT, L.P., Appellants**

**V.**

**EPSTEIN, BECKER, GREEN, WICKLIFF & HALL, P.C., EPSTEIN BECKER & GREEN, P.C., AND STEPHEN R. COCHELL, Appellees**

**On Appeal from the 80th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2010-41660**

## S U B S T I T U T E   O P I N I O N

We issued an opinion in this case on October 31, 2013, reversing the trial court's summary judgment and remanding the case. Appellees subsequently filed

a motion for rehearing. Without changing the disposition of the case, we deny the motion for rehearing, withdraw our previous opinion, and issue this substitute opinion.

In this attorney malpractice case, the plaintiffs are an individual, Mark A. D'Andrea, M.D., and various business entities of which D'Andrea is the self-described "*de facto* owner." We refer to the business entities collectively as "Gulf Coast." The defendants, attorney Stephen R. Cochell and the law firm of Epstein, Becker, Green, Wickliff & Hall, P.C. (collectively, "the firm") represented Gulf Coast and D'Andrea in various matters. The plaintiffs assert claims against the firm for negligence, breach of fiduciary duty, an unspecified intentional tort, and common-law fraud.

The representation at issue began when the firm prepared a "memo" at the request of Gulf Coast general counsel Kirk Kennedy that contained serious allegations against D'Andrea. The firm prepared the memo knowing Kennedy would soon be fired as general counsel, and it provided Kennedy with a copy of the memo after he had been fired. Kennedy's possession of the memo ultimately caused D'Andrea and Gulf Coast considerable expense and frustration. This case began when both D'Andrea and Gulf Coast sued the firm for negligence and other claims.

The trial court granted the firm's motion for final summary judgment based on specific grounds. The trial court granted summary judgment against D'Andrea's claims on the following grounds: (1) D'Andrea was not a client of the firm as to the memo and lacked standing to assert the rights of Gulf Coast, so the firm owed him no duty, and all of his claims failed as a matter of law; and (2) though there was an attorney-client relationship between the firm and D'Andrea regarding the bankruptcy proceeding, there is no evidence that this proceeding was

in any way related to the memo. We conclude that the trial court erred in granting summary judgment on these grounds.

The trial court also granted summary judgment against Gulf Coast's claims because it concluded that even if the firm's preparation of the memo was negligent, Kennedy's unforeseeable use of the memo broke the chain of proximate causation between this negligence and the harm to Gulf Coast. We disagree because there are fact questions regarding the foreseeability of harm to Gulf Coast. Accordingly, we reverse and remand.

## BACKGROUND

There has been considerable litigation about the memo. The trial court ordered the document sealed, and specific discussion of its contents is unnecessary to write a "cogent, meaningful opinion," *see R.V.K. v. L.L.K.*, 103 S.W.3d 612, 614 (Tex. App.—San Antonio 2003, no pet.), so there will be no such discussion here. For our purposes, it suffices to say that much ink has been spilled and much money spent to keep the memo's contents secret. We also note that D'Andrea describes the memo as "a big lie."

The firm prepared the memo in 2009 at the request of Kennedy, Gulf Coast's general counsel and corporate secretary at the time. A month before commissioning the memo, plaintiffs allege that Kennedy "secretly deposited" $412,000 belonging to Gulf Coast into an account under his sole control. He allegedly used $35,000 of the secreted funds to pay the firm's retainer for preparing the memo.

Although Kennedy requested the memo, there is no contention that the firm prepared it for Kennedy personally. Indeed, when Gulf Coast later sought an injunction requiring Kennedy to turn over all copies of the memo, our sister court

3

upheld a finding that Kennedy was not the firm's client for purposes of the memo. *See Kennedy v. Gulf Coast Cancer & Diagnostic Ctr. at Se., Inc.*, 326 S.W.3d 352, 358 (Tex. App.—Houston [1st Dist.] 2010, no pet.).

The memo's stated purpose was "to apprise the . . . President and Board . . . as to Gulf Coast's potential . . . exposure . . . arising from Dr. D'Andrea's alleged misconduct." Thus, Gulf Coast was the firm's client. Although the Gulf Coast entities had their own business structures and officers, D'Andrea testified that he was the "*de facto* owner" who "made the decisions" and "produced all [the] revenue" for all of the Gulf Coast entities. Attorney Stephen R. Cochell spearheaded the memo's preparation for the firm while personally representing D'Andrea in unrelated litigation.[1] Until its work was complete, the firm contacted no officers or directors of its client Gulf Coast other than Kennedy.

Kennedy's largely unsubstantiated allegations against D'Andrea provided the factual basis for the opinions in the memo; the firm performed no independent investigation. As work on the memo progressed, the firm received indications that Gulf Coast would soon fire Kennedy or may have fired him already. The firm also received indications that Kennedy would use the memo in litigation against Gulf Coast. For example, Kennedy specifically asked that the firm's memo inform Gulf Coast's president about a statute making it illegal to fire whistleblowers.

Notwithstanding the indications that Kennedy was adverse to its actual client, Gulf Coast, the firm emailed the memo to Kennedy. It also sent a copy to the president of Gulf Coast. Kennedy received the memo the day after Gulf Coast fired him for theft. Plaintiffs allege that once Kennedy got the memo, he "refused to return his copy . . . and began showing it to lawyers and talking about the

---

[1] The nature of the unrelated litigation is not relevant to our analysis. It involved an appeal that was decided in *In re ProEducation International, Inc.*, 587 F.3d 296 (5th Cir. 2009).

'[firm's] investigation' that purportedly found 'wrongdoing.'" Kennedy allegedly "claim[ed] that he was fired because he obtained an outside opinion of wrongdoing." Plaintiffs also allege that Kennedy "tried to use the memo to blackmail Gulf Coast into paying money that was not owed." Plaintiffs assert that the memo "all but destroyed" D'Andrea's practice.

Gulf Coast and D'Andrea sued the firm, alleging negligence, breach of fiduciary duty, an unspecified intentional tort, and common-law fraud. The firm filed a traditional and no-evidence motion for summary judgment, contending that the plaintiffs should take nothing on their claims. The trial court granted the motion and signed an order specifying the reasons for its ruling, as discussed above. Gulf Coast and D'Andrea then filed this appeal.

## ANALYSIS

### I. Standard of review

We review a trial court's order granting summary judgment de novo. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013). To defeat a no-evidence summary judgment, the nonmovant must produce more than a scintilla of evidence establishing the existence of each challenged element of its claim or defense. Tex. R. Civ. P. 166a(i); *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). To be entitled to a traditional summary judgment, the movant must demonstrate that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). If the movant does so, the burden shifts to the nonmovant to produce evidence sufficient to raise a fact issue. *Walker v. Harris,* 924 S.W.2d 375, 377 (Tex. 1996). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor.

5

*Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).[2]

When, as here, the trial court expressly bases its summary judgment only upon certain grounds, we must consider all of the grounds upon which the trial court rules if they are preserved for our review and necessary to dispose of the case. *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 624 (Tex. 1996). We may review additional summary judgment grounds, but we need not and do not do so here.[3] *Id.*

## II.    The trial court erred in granting a take-nothing summary judgment.

The trial court granted summary judgment against D'Andrea's claims on the following grounds: (1) D'Andrea was not a client of the firm as to the memo and lacked standing to assert the rights of Gulf Coast, so the firm owed him no duty, and all of his claims failed as a matter of law; and (2) though there was an attorney-client relationship between the firm and D'Andrea regarding the bankruptcy proceeding, there is no evidence that this proceeding was in any way related to the memo. As discussed below, these grounds do not provide a basis for affirming the trial court's summary judgment against D'Andrea's claims.

---

[2] The firm's motion for summary judgment contains many overlapping grounds for both no-evidence and traditional summary judgment, and it is not always clear from the trial court's order which type of summary judgment it is granting and on what grounds. We conclude it is unnecessary to conduct separate reviews of the summary judgment under the no-evidence and traditional standards, however. As to each ground addressed below, the evidence that D'Andrea and Gulf Coast produced in response to the no-evidence summary judgment motion is both more than a scintilla and creates a genuine issue of material fact as to each challenged element.

[3] For example, the firm argues it is also entitled to summary judgment based on an element challenged in its motion but not addressed in the judge's order—cause in fact. We do not reach that issue.

Second, the trial court granted summary judgment against Gulf Coast's claims on the ground that the evidence conclusively established that any breach by the firm did not proximately cause Gulf Coast's damages. Instead, the court concluded that Kennedy's breach of his fiduciary duty to Gulf Coast was a superseding, intervening cause that cut off the chain of proximate causation. As we explain below, however, there are fact questions regarding (1) whether the harm to Gulf Coast was a generally foreseeable result of preparing the memo, and (2) whether Kennedy's breach was foreseeable.

### A. The grounds stated in the trial court's order do not support summary judgment against D'Andrea's claims.

In their first issue, the plaintiffs challenge the trial court's grant of summary judgment against D'Andrea's claims. The trial court's summary judgment order included two paragraphs explaining the basis for its ruling on those claims. In the first paragraph, the court concluded that "[t]here is no evidence of an attorney-client relationship between [the firm] and D'Andrea in his individual capacity with regard to the memo. Even if D'Andrea is the primary or sole owner of the Gulf Coast entities, [the firm] owed him no duty and he lacks standing to recover for injuries to Gulf Coast."

We interpret this paragraph as granting summary judgment based on multiple grounds raised in the firm's motion. Those grounds asserted that D'Andrea was not a client of the firm as to the memo and lacked standing to assert the rights of Gulf Coast, so the firm owed him no duty and all of his claims failed as a matter of law.[4]

We hold that the firm is not entitled to summary judgment on those grounds. Undisputed evidence shows that the firm represented D'Andrea in unrelated

---

[4] *See* 2 CR 131, 134–35, 142–44.

7

bankruptcy litigation at the time it produced the memo. The firm thus owed D'Andrea duties as a current client, including a duty of reasonable prudence and fiduciary duties of loyalty and good faith. *See Cosgrove v. Grimes*, 774 S.W.2d 662, 664 (Tex. 1989); *Authorlee v. Tuboscope Vetco Int'l, Inc.*, 274 S.W.3d 111, 126 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) ("[A]n attorney owes a duty of loyalty and good faith to each client . . . ."). The relevant question is the scope of the firm's duties and whether the firm breached them by preparing the memo or engaging in other allegedly actionable conduct. Thus, even assuming for the sake of argument that D'Andrea was not a client as to the memo, and that D'Andrea lacks standing to assert the rights of Gulf Coast, these premises do not establish as a matter of law that the firm owed D'Andrea no duty or that all of D'Andrea's claims fail as a matter of law.

In its second paragraph addressing D'Andrea's claims, the trial court concluded that "while there was an attorney-client relationship between [the firm] and D'Andrea with regard to the bankruptcy proceeding, there is no evidence that that proceeding was in any way related to the memo." Standing alone, the lack of a relationship between the bankruptcy and the memo does not establish as a matter of law that the firm's work on the memo could not breach its duties to D'Andrea arising from the bankruptcy representation. Therefore, this ground does not support the trial court's summary judgment against D'Andrea's claims.

The trial court's second paragraph may have been intended to grant summary judgment based on the following ground raised in the firm's motion: that as a matter of law there was no conflict of interest prohibiting the firm from representing D'Andrea in the bankruptcy litigation while also preparing the memo. In particular, the firm argued that it did not violate the Disciplinary Rules with regard to concurrent representation, and thus it could not be held liable for breach

of fiduciary duty. But the firm's conclusion does not follow from its premise. Even if the trial court's order were construed as granting partial summary judgment based on this ground, we conclude the summary judgment evidence does not prove the firm's entitlement to that relief.

The firm directs us to Rule 1.06 of the Texas Disciplinary Rules of Professional Conduct, which provides in relevant part:

> (a) A lawyer shall not represent opposing parties to the same litigation.
>
> (b) In other situations and except to the extent permitted by [an exception allowing concurrent representation with client consent], a lawyer shall not represent a person if the representation of that person:
>
>> (1) involves a substantially related matter in which that person's interests are materially and directly adverse to the interests of another client of the lawyer or the lawyer's firm; or
>>
>> (2) reasonably appears to be or become adversely limited by the lawyer's or law firm's responsibilities to another client or to a third person or by the lawyer's or law firm's own interests.[5]

Even if the firm's preparation of the memo did not violate this rule (an issue we discuss further below), we disagree with the firm's position that it could not be held liable for breach of fiduciary duty.

The flaw in the firm's argument is that a violation of the disciplinary rules is not necessary and may not be sufficient to establish civil liability for attorneys. Indeed, "the Texas disciplinary rules . . . do not establish the standard of care or civil liability for attorneys." *Greenberg Traurig of New York, P.C. v. Moody*, 161 S.W.3d 56, 96 (Tex. App.—Houston [14th Dist.] 2004, no pet.); *see also* Tex. Disciplinary Rules Prof'l Conduct preamble ¶ 15; *cf. Fleming v. Kinney ex rel.*

---

[5] Tex. Disciplinary Rules Prof'l Conduct R 1.06, *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G app. A (West 2004).

*Shelton*, 395 S.W.3d 917, 929 (Tex. App.—Houston [14th Dist.] 2013, pet. filed) (expert's testimony "crossed the border of inadmissibility" when she told the jury, among other things, that violation of certain disciplinary rules necessarily established breach of fiduciary duty).[6]

Here, D'Andrea introduced expert testimony that "[p]reparation of the memo required [the firm] to take positions adverse to Dr. D'Andrea and as a result [the firm] breached [its] duty of loyalty." The expert stated that the firm also "breached [its] duty of loyalty to Dr. D'Andrea by providing the . . . memo to Kennedy, a person [the firm] knew to be adverse to Dr. D'Andrea." The expert also noted that the investigation brought the firm's interests into conflict with D'Andrea's, so "[a]t a minimum," the firm should have notified D'Andrea. This testimony raises a fact issue regarding whether the firm breached its fiduciary duty to D'Andrea, its current client.[7]

Moreover, even if we were to conclude that the common-law standard regarding breach of fiduciary duty resembles Rule 1.06 (an issue we do not decide), the application of that standard would not be as straightforward as the firm suggests. The rule's comments contemplate that lawyers will sometimes avoid representations that the rule might otherwise permit. For example, according to one comment,

> Even when neither paragraph [barring concurrent representation based upon a specific conflict] is applicable, a lawyer should realize that a business rivalry or personal differences may be so important to one or

---

[6] The firm itself recognized this rule in its summary judgment motion, arguing that plaintiffs could not maintain a cause of action against it for violating the disciplinary rules.

[7] The firm argues that to hold it may be professionally liable while complying with the disciplinary rules requires us to "assume the role of the legislature." But the Legislature did not write the disciplinary rules. Moreover, the authorities cited above, among others, establish that the disciplinary rules do not necessarily set the standard for D'Andrea's common-law claims.

both that one or the other would consider it contrary to its interests to have the same lawyer as its rival even in unrelated matters; and in those situations a wise lawyer will forego the dual representation.

Tex. Disciplinary Rules Prof'l Conduct R. 1.06 cmt. 6. Another comment goes even further, stating that "[o]rdinarily, it is not advisable for a lawyer to act as an advocate against a client the lawyer represents in some other matter, even if the other matter is wholly unrelated and even if [the portion of the rule quoted above is] not applicable." *Id*. cmt. 11. Moreover, "[t]he propriety of concurrent representation can depend on the nature of the litigation. For example, a suit charging fraud entails conflict to a degree not involved in a suit for declaratory judgment concerning statutory interpretation." *Id*.

The firm's preparation of the memo falls on the high-conflict part of this spectrum. Kennedy requested a memo to document and analyze D'Andrea's alleged actions—actions that Kennedy believed to be improper and possibly illegal. In this way, the memo required the firm to attack directly the integrity of its current client. According to D'Andrea's expert, such an action is inconsistent with the duty of loyalty the firm owed to D'Andrea.

In sum, although the memo's subject matter was not substantially related to the firm's representation of D'Andrea, preparation of the memo nonetheless implicated the firm's fiduciary duty to D'Andrea—as D'Andrea's expert and the comments to Rule 1.06 show. The trial court erred in granting summary judgment against D'Andrea's claims on the grounds stated in its order. We sustain the plaintiffs' first issue and reverse the summary judgment against D'Andrea's claims.[8]

---

[8] The firm cites *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 753 (Tex. 2003), for the proposition that "there is no prohibition against representing a new client in a matter that involves an existing client." What *King Ranch* held, however, was that "simultaneous

11

**B.** **There are fact questions regarding whether the damage that Gulf Coast suffered from the memo's production was foreseeable.**

In their second and third issues, the plaintiffs argue that the trial court erred by granting summary judgment against all of Gulf Coast's claims. The trial court concluded "there [wa]s no evidence showing that [the firm's] alleged malpractice and breach of fiduciary duty proximately caused [the Gulf Coast entity clients'] harm."[9] Instead, it held that "the summary judgment evidence conclusively establishe[d] that [Kennedy's use of the memo] was not [a foreseeable result of the firm's alleged negligence]." The court held that this absence of foreseeability entitled the firm to summary judgment. We disagree.

The trial court relied upon cases in which an intervening crime or tort broke the chain of proximate cause connecting negligence to injury. *Dyess v. Harris*, 321 S.W.3d 9, 16–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (foster parents had no duty to prevent one foster child from sexually assaulting others where sexual assault was not foreseeable); *see also Phan Son Van v. Pena*, 990 S.W.2d 751, 755 (Tex. 1999) (store that sold alcohol to minors not liable for minor's criminal acts where acts were not foreseeable result of alcohol use); *Barton v. Whataburger, Inc.*, 276 S.W.3d 456, 463 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (restaurant not liable for wrongful death during robbery). The trial court reasoned, and the firm now argues, that harm to Gulf Coast was unforeseeable because no one could have known that Kennedy would use the memo against his client, Gulf Coast. As a result, the trial court concluded that Kennedy's breach, like a criminal act, severed the chain of proximate cause.

---

representation in unrelated matters is not evidence of a fraudulent conspiracy" between the attorney and one of the clients. *Id.* at 752. It does not follow from *King Ranch* that an attorney cannot breach a fiduciary duty by representing directly adverse clients in unrelated matters.

[9] The plaintiffs have not sought fee forfeiture in this case.

We disagree with this conclusion for two independent reasons.  First, there was evidence that a reasonably prudent attorney would carefully consider not opining in writing upon allegations like Kennedy's because the writing could later be used against the attorney's client.  Second, Kennedy's own actions raise a fact issue regarding whether his use of the memo against Gulf Coast was foreseeable.

### 1. *Gulf Coast introduced evidence that preparing a written investigation report can breach the standard of care because it is foreseeable the document will become public.*

"Foreseeability requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable."  *Walker*, 924 S.W.2d at 377.  Thus, Kennedy's misuse of the memo need not have been foreseeable if it was generally foreseeable that the memo was likely to harm Gulf Coast.  *Id.*[10]  Because the plaintiffs introduced evidence of such general foreseeability, the trial court erred in granting summary judgment.

Specifically, Gulf Coast's evidence raises a fact issue regarding whether preparing a written report, like the one the firm prepared, breaches the standard of care.  For example, according to one source submitted with Gulf Coast's summary judgment evidence, written reports "typically [have] limited utility and [carry]

---

[10] The firm argues that *Walker* requires "particularized evidence of prior [similar] conduct" to raise a fact issue on foreseeability.  We disagree.  *Walker* involved a criminal act at an apartment complex, and the court explained that "evidence of specific previous crimes on or near the premises may raise a fact issue on the foreseeability of criminal activity."  924 S.W.2d at 377.  But *Walker* did not say such evidence is the only way to raise a fact issue, *see Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 767–69 (Tex. 2010) (discussing multi-factor test for foreseeability of criminal conduct), nor did it address cases (like this one) that do not allege criminal activity.  Moreover, as we will explain, Gulf Coast offered evidence that it was foreseeable that writing this particular memo would cause it harm.  *Walker* holds the "exact sequence of events that produced" this harm need not be foreseeable.  924 S.W.2d at 377; *see also Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 551 (Tex. 1985) ("*[I]t is not required that the particular accident complained of should have been foreseen.*" (quoting *Carey v. Pure Distrib. Corp.*, 124 S.W.2d 847, 849 (Tex. 1939)).

great risk." Am. Coll. Trial Lawyers, Recommended Practices for Companies and Their Counsel in Conducting Internal Investigations 11 (2008). As a result, "[t]he goal at the outset of an internal investigation should be frequent updating by oral reporting," and "[c]areful consideration should be given to the extent to which written reports should be rendered, if at all." *Id.* Written interim reports, according to the recommended practices, "run the risk of creating confusion and credibility issues, as well as potential unfairness to officers and employees who are the subjects of the investigations, if facts discovered in the latter part of the investigation are inconsistent with the preliminary factual determinations or interim substantive findings." *Id.* Moreover, "[t]he [written or oral] form of the [final] report . . . should be analyzed because of the likelihood that some version of the report will likely make it into the hands of government authorities or plaintiffs' attorneys, resulting in the substantial risk of enhanced civil litigation against the Company, and the officers and directors." *Id.* at 21.

The affidavit of Gulf Coast's expert further supports Gulf Coast's assertion that preparing a written report created a foreseeable possibility that the report would be misused. The expert testified that the firm breached the standard of care by "[a]greeing to put the matters at issue in written form at the outset without first conferring with [Gulf Coast's] management and advising them of the risks inherent in publishing Kennedy's allegations and their comments on these allegations."[11]

According to this summary judgment evidence, the standard of care requires lawyers to consider carefully whether to opine in writing during internal investigations because written opinions have the potential to harm clients. This

---

[11] The firm contends that the expert's report is conclusory and "mere *ipse dixit*" and therefore no evidence that a prudent attorney would have foreseen the production of a written memo being harmful under these circumstances. But Gulf Coast also introduced the recommended practices discussed above, which explain why such written reports are foreseeably harmful.

standard requires reasonably prudent attorneys to foresee that sensitive written investigations may fall into the hands of parties adverse to the client and to consider this possibility before putting those opinions in writing. An understanding that the material foreseeably could come to light is thus required for a lawyer to conduct such an investigation competently.

Here, the firm came closest to "carefully considering" the production of a written report when an associate of the firm wrote in an email that he was not sure the firm was in a position to respond to all of the allegations and suggested that the firm conduct a more formal inquiry before assessing exposure and recommending corrective action. Notwithstanding the associate's concerns, the record contains no indication that the firm ever discussed the report's potential for harm with any official from Gulf Coast.

In sum, there are fact issues regarding whether a reasonably prudent attorney would have foreseen that a written memo was likely to harm the client, whether such a lawyer would have produced the memo, and what steps a reasonably prudent lawyer would have taken before doing so. Accordingly, the trial court erred in granting summary judgment against Gulf Coast's claims.

### 2. *Indications that Kennedy was adverse to Gulf Coast before the firm sent him the memo raise a fact issue regarding whether his use of the memo against Gulf Coast was foreseeable.*

We also disagree with the trial court's summary judgment because there is evidence the firm received indications that Kennedy was considering litigation against Gulf Coast, raising a fact issue regarding whether Kennedy's betrayal of Gulf Coast was foreseeable. A third party's intervening tortious act is not a superseding cause of harm if that act is a foreseeable result of the defendant's negligent conduct. *Phan Son Van*, 990 S.W.2d at 753–54. Thus, in this case, the

15

mere fact that Kennedy, and not the firm, used the memo against Gulf Coast does not sever as a matter of law the causal chain between the firm's alleged negligence and the harm Gulf Coast suffered.

Rather, the controlling inquiry is "whether the intervening cause and its probable consequences were such as could reasonably have been anticipated by the original wrongdoer." *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 858 (Tex. 2009); *see also Phan Son Van*, 990 S.W.2d at 754 ("[T]o be a superseding cause, the intervening force must not be ordinarily or reasonably foreseeable."). To defeat a no-evidence summary judgment under this standard, Gulf Coast was required to offer more than a scintilla of evidence that Kennedy's use of the memo against Gulf Coast was foreseeable by the firm. *Phan Son Van*, 990 S.W.2d at 753 n.2. Several pieces of evidence demonstrate that Gulf Coast made this showing. For example, more than a year before preparing the memo, Cochell, the firm lawyer who represented D'Andrea and Gulf Coast, looked into getting Kennedy a job with the firm. This fact shows that, at an early stage, Cochell and Kennedy communicated about Kennedy's eventual exit from Gulf Coast.

These communications continued when, months before requesting the memo, Cochell referred Kennedy to "a plaintiff's attorney" certified in labor and employment law. Kennedy evidently sought "advice, support, and guidance" from this attorney regarding a "contract question" related to Kennedy's employment contract with Gulf Coast.[12]

---

[12] The record contains a letter from the attorney to Kennedy, reflecting a consultation between the two. There is also a copy of Kennedy's employment contract containing several margin notes. One note reads "* Key provision" with an arrow pointing to the contract's "Termination" section. Another says: "Issue: If Company Elects to terminate, do I still receive remaining term of two years, less mitigation?"

It is unclear from the record whether Kennedy communicated his termination concerns to Cochell at this point. Nonetheless, the evidence that Cochell tried to help Kennedy find a new job and referred him to a plaintiff's-side employment attorney suggests that Cochell also may have known that Kennedy would soon be fired.

In any event, as the memo's preparation progressed, Kennedy's imminent departure from Gulf Coast became apparent. Less than a week before delivering the memo, Cochell solicited advice from other members of the firm, informed them that "[t]he GC [(Kennedy)] thinks he is about to be fired tomorrow or in the next couple days," and described the memo as an "emergency project," stating that Kennedy wanted the memo "as quickly as possible." Two days before the firm sent Kennedy the memo, Kennedy emailed Cochell, writing "I DO NOT HAVE access to Company e-mail any more. Send any e-mails or docs to this [personal] account for now." When the memo was finished, Cochell attempted to email a copy of it to Kennedy's Gulf Coast account in spite of this warning, but the email was undeliverable. Cochell then emailed a copy of the memo to Kennedy's personal account. Cochell also sent a copy to Gulf Coast's president.

Correspondence between Kennedy and Cochell also suggested that Cochell knew Kennedy was assembling evidence to use against Gulf Coast. Two days before the memo's delivery, Kennedy forwarded Cochell an email from a Gulf Coast employee, whom D'Andrea had recently "let go." In the email, the former employee offered to "have any investigator hire [him] as . . . a fully qualified 'Expert Witness' in any full-scale investigation." The employee went on to detail various allegations against Gulf Coast.

The next morning, Kennedy sent Cochell section 161.134 of the Health and Safety Code, which prohibits certain medical facilities from retaliating against

employees who report violations. The section also creates a presumption that a termination within sixty days of a report is retaliatory. Tex. Health & Saf. Code Ann. § 161.134 (a), (f) (West 2010). Kennedy wrote that the firm "[s]hould probably include this [statute] in the memo so that [the president of Gulf Coast] is on notice."

Summarizing this evidence in the light most favorable to Gulf Coast, when the firm sent a copy of the memo to Kennedy, it knew that: Kennedy was about to be fired or perhaps already had been fired; litigation over his firing was possible; Kennedy had recruited a recently-fired employee to help investigate Gulf Coast; and Kennedy wanted Gulf Coast on notice that it was a violation of the law to fire him for reporting the allegations in the memo. These circumstances create a fact issue regarding whether it was foreseeable that Kennedy would use the memo to harm Gulf Coast. In particular, Kennedy's desire to notify Gulf Coast of the consequences of firing him creates a fact issue as to whether Kennedy would foreseeably disclose the memo to avoid being fired or use the memo in suing Gulf Coast for firing him.[13]

---

[13] The firm contends we are required to apply the six foreseeability factors discussed in *Phan Son Van* to determine whether this evidence is sufficient to raise a fact issue on foreseeability. But *Phan Son Van* referred to those factors to determine where the burden lies on summary judgment, *see* 990 S.W.2d at 754, and both it and later cases have emphasized that the controlling inquiry is the one we quote above from *Columbia Rio Grande Healthcare*. *See also Dew v. Crown Derrick Erectors, Inc.*, 208 S.W.3d 448, 451–52 (Tex. 2006) (recognizing that the factors generally parse the core principle "that a superseding cause ordinarily involves the intervention of an unforeseen, independent force from a third party, causing injury different from that which might have been expected at the time of the original negligent act," and that not all factors are relevant in each case).

In any event, the evidence we have discussed is sufficient to raise a fact issue under the first three foreseeability factors because it tends to show that Kennedy's use of the memo against Gulf Coast: (a) caused the very harm to Gulf Coast that the firm risked by putting the memo in writing; (b) does not appear extraordinary given the information available to the firm that Kennedy was considering litigation against Gulf Coast; and (c) was not independent from the situation created by the firm in writing the memo and sending it to Kennedy. As we recently

A reasonable jury could conclude that the firm's knowledge of these facts at the time it sent the memo to Kennedy made it foreseeable that Kennedy would use the memo against Gulf Coast, the firm's client.[14] The trial court therefore erred by holding it was unforeseeable as a matter of law that Kennedy would use the memo against Gulf Coast.[15] Accordingly, we sustain the plaintiffs' second and third issues and reverse the trial court's summary judgment against Gulf Coast's claims.[16]

---

observed, these three factors are "particularly important" in determining foreseeability. *Doe v. Messina*, 349 S.W.3d 797, 801 (Tex. App.—Houston [14th Dist.] 2011, no pet.). The remaining factors, even though they also tend to show Kennedy's culpability, do not necessarily make his conduct a superseding cause. *See Columbia Rio Grande Healthcare*, 284 S.W.3d at 858.

[14] The trial court concluded, and the firm argues, that Kennedy's actions were unforeseeable as a matter of law because "an attorney should . . . be entitled to rely upon another attorney's fulfillment of his ethical responsibilities to his client." Even if we agree with this statement as a general matter, here Kennedy's actions create a fact issue regarding whether it was foreseeable that he would breach his duties to Gulf Coast. *See Fin. Freedom Senior Funding Corp. v. Bellettieri, Fonte & Laudonio, P.C.*, 852 F. Supp. 2d 430, 433, 438 & n.5 (S.D.N.Y. 2012) (where lawyer "'ignored warning signs'" of partner's check kiting scheme, question of fact existed regarding whether lawyer committed negligence).

[15] The trial court also granted summary judgment against the plaintiffs' intentional tort and common-law fraud claims based upon the absence of foreseeability. In their fourth and fifth issues, the plaintiffs argue that the trial court erred by dismissing these claims because the firm failed to attack these claims in its summary judgment motion, and because foreseeability is not an element of common-law fraud. Because we conclude that the trial court erred by holding that Kennedy's acts were unforeseeable as a matter of law, and this was also the trial court's basis for disposing of the intentional tort and common-law fraud claims, we reverse the trial court's summary judgment on the intentional tort and common-law fraud claims as well. We express no opinion regarding whether foreseeability is an element of the plaintiffs' intentional tort or fraud claims.

[16] Given our disposition of the other issues, we need not reach the plaintiffs' sixth issue, which complains that the trial court erred by excluding the testimony of one of their expert witnesses.

## CONCLUSION

For these reasons, we reverse the trial court's summary judgment and remand the case for further proceedings consistent with this opinion.

/s/          J. Brett Busby
                 Justice

Panel consists of Chief Justice Frost and Justices Jamison and Busby.